Gabrielli, J.
Defendant’s conviction, following a jury verdict, of the crime of felony murder (Penal Law, § 125.25, subd 3) has been affirmed by an unanimous Appellate Division. As we choose to frame it, the dispositive issue presented on this appeal may be posed as follows: did the illegality of the initial "stop” of the automobile in which defendant was a passenger taint the arrest for illegal possession of a firearm and thus, perforce, the subsequent station house interrogation of the defendant concerning the homicide for which he was ultimately convicted. If this question is answered in the affirmative, the admissions made by him during the interrogation, as well as the incriminating evidence to which those admissions may have led, are subject to the exclusionary rule of Weeks v United States (232 US 383) (see, also, People v Rodriguez, 11 NY2d 279, 286) held applicable to the States in Mapp v Ohio (367 US 643) and would then have been improperly admitted at trial. We are thus asked to delineate the scope of the exclusionary rule and to define the point at which evidence is sufficiently removed from any questionable police conduct as to survive the " 'fruit of the poisonous tree’ ” doctrine set forth in Wong Sun v United States (371 US 471, 488). (See, also, People v Robinson, 13 NY2d 296, 301.)
On April 1, 1971, defendant was a passenger in an automobile, parked at the curb with its motor running, in front of a liquor store in a "high crime” area in the Borough of Queens. Sometime after 11:00 a.m., two New York City police officers, Wilson and Quinlan, approached the vehicle and asked the driver for his license and registration. Later, at the hearing on the motion to suppress, Officer Wilson explained that he took such action because he suspected "there was possibly something going on in reference to the liquor store.” He further stated that the "time of day” and the "dirty” and "rogue-y” appearance of the vehicle’s occupants formed the basis of his suspicions. When the driver made what Officer Wilson characterized as a "quick” motion toward the glove compartment, he *665 opened the door of the automobile and spotted a gun on the floor in the rear of the car. He seized the gun and arrested the occupants of the automobile.
Following defendant’s arrest, Patrolmen Wilson and Quinlan took him to the 103rd Precinct. Shortly before noon, detectives investigating the robbery and homicide of one Leonid Manague, which occurred six days earlier near a Lafayette Radio Store in Queens, indicated to Officer Wilson that they wanted to ask defendant some questions about a "homicide”. Appellant was adequately informed of his rights including the right to remain silent and the right to the assistance of counsel. During the course of the interrogation by the homicide squad detectives which followed, defendant admitted only (1) that on the night of the mugging he was out with one "Geraldine Neal” and a fellow named "Egghead” and (2) that he, "Egghead” and Miss Neal were "over by the Lafayette Radio Store” on that evening. Defendant did not make a confession but, in fact, explicitly denied involvement in the homicide. In that sense, his statements were intended to be exculpatory. After the interrogation at the 103rd Precinct, defendant was taken to night court for arraignment on the weapons charge for which he was arrested. On the day of defendant’s arrest, Detective Green, a member of the homicide squad investigating the Manague murder, brought Miss Neal to the station house.[1] She stated to the police that defendant "told her he had stabbed a white fellow over by Lafayette and mugged him with an 007 knife”. The detectives also learned from her the address of the apartment where defendant often spent the night. When investigating detectives went to that address and gained entrance by consent of the occupants, they discovered a leather coat which was later identified as belonging to the victim. In the pocket of the coat a "switchblade knife” was found. These items were introduced against defendant at trial along with the testimony of Miss Neal, her mother and sister to the effect that defendant had these items on the night of the mugging. Defendant’s own station house admissions were also introduced against him.
At the hearing on the motion to suppress the gun seized pursuant to the initial stop, the statement made by the defendant during the interrogation and the knife and coat, the *666 court ruled that all the evidence was admissible. The Trial Judge found that the initial stop[2] and arrest were justified. With respect to the statements made by defendant, he concluded that the defendant had been informed of his rights under Miranda v Arizona (384 US 436) and that he knowingly and intelligently waived these rights. The court also concluded that the statements were voluntary and not the product of a coercive interrogation.
In Wong Sun v United States (371 US 471, supra), the Supreme Court recognized the applicability of the exclusionary rule to the verbal fruits of an unauthorized arrest. In that case, the court also held that the Fourth Amendment did not require the summary exclusion of all evidence connected with alleged illegal police conduct and, in terms somewhat opaque, also said that the relevant question is whether the evidence was obtained by exploitation of the illegality or by means "sufficiently distinguishable to be purged of the primary taint.” (Wong Sun v United States, 371 US 471, 488, supra). The court reasoned that the statement of defendant Wong Sun was admissible because it was made voluntarily several days after arraignment following defendant’s release on his own recognizance, and thus could be characterized as an act of "free will” (p 486). On the other hand, the statements of defendant Toy were held inadmissible because they were made under coercive conditions, minutes after Federal agents forced their way into his home.
More recently, faced with the precise issue raised in this case, the Supreme Court added further content to the "attenuation” doctrine articulated in Wong Sun. Dealing with a custodial statement made subsequent to an unlawful arrest, the court, in a narrow holding, said that Miranda warnings "alone and per se, cannot always make the act sufficiently a product of free will to break, for Fourth Amendment purposes, the causal connection between the illegality and the confession” (Brown v Illinois, 422 US 590, 603.) Three factors were deemed relevant in determining whether a confession or admission was produced by exploitation of an illegal arrest: (1) "[t]he temporal proximity of the arrest and confession”; (2) "the presence of intervening circumstances” and (3) "the purpose and flagrancy of the official misconduct.” (Brown v *667 Illinois, 422 US 590, 603, 604, supra.)
In the intervening period between the Wong Sun and Brown decisions, many of the lower Federal courts focused upon the purpose and character of the challenged police activity in determining whether evidence gleaned from such activity was subject to the exclusionary rule. Thus, in Collins v Beto (348 F2d 823), the court held that a confession should be suppressed where the police had absolutely no reasonable basis for arresting the defendant for a vagrancy charge and the arrest was merely a ruse to detain defendant for questioning. The United States Court of Appeals for the Third Circuit suppressed a confession pursuant to an illegal detention, lasting 44 hours, which was aimed at enabling police officers to build a case against the defendant (United States ex rel. Gockley v Myers, 450 F2d 232). In United States v Edmons (432 F2d 577) the pretext of arresting defendant for Selective Service Act violations was utilized to enable government agents to identify the defendants for another crime and the court held that such a sham arrest could not provide the basis for the detention, and the confession obtained thereby was excluded under the "fruit of the poisonous tree” doctrine.
Our own court has had occasion to condemn the device of the sham arrest in the context of the right to counsel. In People v Jackson (22 NY2d 446, 451) Chief Judge Fuld wrote that "statements taken from a defendant after he has been subjected to a sham arraignment, usually for vagrancy, are inadmissible”. (See, also, People v Robinson, 13 NY2d 296, 301, supra; People v Malloy, 22 NY2d 559.)
The requirements that a defendant’s statement be voluntary and that Miranda warnings be given have, of course, been deemed essential for the admissibility of a defendant’s custodial statements.[3] These requisites satisfy the demands of the Fifth Amendment privilege against self incrimination, but also serve the purposes of the Fourth Amendment protection against unreasonable searches and seizures. However, under Brown v Illinois (supra), Miranda warnings are not in themselves sufficient to enable custodial statements to pass Fourth Amendment muster when the propriety of official conduct is *668 in question. We hold today that in addition to the dictates of Miranda and the standard of voluntariness, the controlling consideration for determining the admissibility of "verbal” evidence obtained pursuant to claimed illegal police conduct is whether law enforcement officers acted in good faith and with a fair basis for belief that probable cause existed for an arrest. We will look directly to the substantiality of the claimed violation of the Fourth Amendment standard in applying the "fruit of the poisonous tree” doctrine. The test developed herein is similar to that advocated by the American Law Institute in its "Model Code of Pre-Arraignment Procedure” (1975 Proposed Official Draft).[4] As the rationale for their position, the drafters of the code assert, correctly we think, that "the exclusion of statements following illegal arrests creates formidable problems in devising a method whereby the police can cure the defect. Should the police be required to release and then rearrest the suspect? Is no subsequent statement to be admissible under any circumstances? If no cure is possible, then the illegal arrest will often have the effect of completely immunizing the defendant from any inquiry, and, indeed, prevent the use of even spontaneous statements.” (Commentary, ALI Model Code of Pre-Arraignment Procedure, 1975 Proposed Official Draft, § 150.2, p 389.)
We turn now to the particular circumstances presented in this case. The stop was improper under the standards we enunciated in People v Ingle (36 NY2d 413, supra)[5] However, a reasonable basis did exist for the arrest, once the gun was discovered on the rear floor of the automobile in which defendant was a passenger. The arrest was clearly not investigatory. *669 Therefore, the officers acted in good faith in detaining the occupants of the automobile. Certainly, the arresting officers, Wilson and Quinlan, had no knowledge of the possible involvement of Martinez in the Manague homicide. The officers were not, as in Davis v Mississippi (394 US 721) or in certain of the other cases, discussed above, perpetrating a sham arrest for the purpose of detaining defendant Martinez in order to construct a homicide case against him. Indeed, upon discovery of the gun, it is difficult to conceive that a reasonable police officer would not take action with respect to the occupants of the automobile.
As far as the weapons charge is concerned, the taint is not sufficiently attenuated to preclude suppression of the gun seized pursuant to the arrest. However, it is not necessary for us to resolve the status of the weapons charge since we deal here only with the custodial statements which were the "verbal fruits” of the arrest. We emphasize too that the fact that the detectives investigating the homicide had independent evidence linking Martinez to the Manague stabbing prior to his detention, serves to break the causal chain between the allegedly unlawful stop and the station house interrogation of the defendant.[6] It also demonstrates the detectives’ good faith basis for questioning the defendant about the homicide. Thus, having found that the arrest and the subsequent interrogation were in good faith, the propriety of the stop becomes irrelevant for purposes of the admissibility of defendant’s custodial statements.
The circumstances here do not manifest the direct causal link between the challenged police conduct and the evidence seized present in People v Ingle (supra). In this case we are articulating standards which serve to ascertain the point at which the causal chain has been broken by intervening circumstances which evidence good faith on the part of law enforcement officers. In this context, Ingle was, of course, correctly decided since the crime charged in that case was the direct product of the concededly illegal stop. Here, the appellant was not tried on the weapon charge.
Our holding today derives a substantial measure of support from the underlying basis for the exclusionary rule. The rule was designed to act as a deterrent to unlawful police activity *670 (Michigan v Tucker, 417 US 433, 447; United States v Calandra, 414 US 338; Elkins v United States, 364 US 206, 217).[7] The heavy sanction exacted by the exclusionary rule is aimed at the preservation of the safeguard against "unreasonable” searches and seizures. The rule’s extension, the "fruit of the poisonous tree” doctrine, represents an attempt "to mark the point at which the detrimental consequences of illegal police action become so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost” (Brown v Illinois, 422 US 590, 609, supra [concurring opn per Powell, J.]). In light of these considerations of deterrence, we choose to focus upon the factual basis for the police action and on the motive at the root of that action, in evaluating the propriety of police conduct. The abusiveness of the official activity under attack is the key ingredient in the Fourth Amendment formula of "reasonableness”. This bench mark of "reasonableness” does not require that all searches and seizures be invalidated per se. Unreasonableness is most clearly demonstrated by a causal connection between the underlying purpose of the challenged arrest and the evidence sought to be excluded (cf. Davis v Mississippi, 394 US 721, 726, 730, supra; Collins v Beto, 348 F2d 823, 827, supra). Our decision should not be interpreted as an effort to weaken the exclusionary rule. This court stands steadfastly prepared to condemn bad police conduct and any abuse of constitutionally acceptable standards, as well as to preserve the integrity of the judicial process from investigatory methods which violate constitutional limitations, State and Federal (see, e.g., People v Sanchez, 38 NY2d 72). The exclusionary rule remains a primary tool for accomplishing this task.
We are mindful that such an approach as we have embarked upon in this analysis must be developed on a case by case basis upon a careful examination of the particular circumstances of the conduct in question. In this case, all the indicia point to the admissibility of defendant’s statements and the "fruits” of these statements.[8] The arrest was made *671 with a fair basis for the judgment that probable cause existed, notwithstanding the questionable validity of the initial contact between the police and the defendant. The interrogation at the precinct was undertaken by detectives who were not involved in the initial stop and who had previously uncovered leads linking defendant to the Manague murder. They were not engaging in a "fishing expedition”. Lastly, it should be noted that we are presented with affirmed findings of the court below that Miranda warnings were given to the defendant and that his statements were voluntarily made. We therefore conclude that no deterrent purpose would be served by the exclusion from evidence of defendant’s statements. The good faith basis for the arrest attenuated any taint which may have colored the stop.
We see no need to discuss the other issues raised by defendant which we find lacking in merit. The order of the Appellate Division should be affirmed.

. The identity of Miss Neal was apparently known to the police prior to April 1. The record indicates that she had told them earlier of Martinez’ involvement in the mugging.

. We do not agree with the court’s determination that the initial "stop” was valid (see People v Ingle, 36 NY2d 413) and, had defendant been prosecuted for illegal possession of the gun, suppression would have been required.

. See, e.g., CPL 60.45 (subd 1); Brown v Illinois (422 US 590, supra); United States v Owen (492 F2d 1100); United States v Davis (456 F2d 1192); United States v Close (349 F2d 841, cert den 382 US 992); People v Spano (4 NY2d 256, rev on other grounds 360 US 315).

. Subdivision (2) of section 150.2 of the Model Code provides: "(2) Statements Made after an Illegal Arrest. If a law enforcement officer, acting without a valid warrant, arrests a person without the reasonable cause required by Section 120.1, and the court determines that such arrest was made without fair basis for the belief that such cause existed, a statement made by such person after such arrest and prior to his release from custody or appearance before a judicial officer pursuant to Subsection 130.2 (1) (b) shall not be admitted in evidence against such person in a criminal proceeding, unless such statement is admissible pursuant to Section 150.3.”
In addition, section 150.3 of the code provides: “(1) Substantial Violations or Exclusion Constitutionally Required. A motion to suppress a statement on any of the grounds set forth in Subsection (1) through (7) of Section 150.2 shall be granted only if the court finds that the violation upon which it is based was substantial, or if otherwise required by the Constitution of the United States or of this State.”

. In People v Ingle (supra, p 414), we held that "fa] single automobile traveling on a public highway may be stopped for a 'routine traffic check’ when a police officer reasonably suspects a violation of the Vehicle and Traffic Law.”

. Detective Ward testified during the Huntley hearing that "Detective Green said that he had some information from people in the street, other sources, that Benny Martinez was involved in the homicide of Leonid Manague.”

. Criticism has been leveled at the efficacity of the exclusionary rule as a deterrent to unconstitutional police activity. We are not prepared to evaluate without empirical evidence the validity of this criticism. (See Commentary, ALI Model Code Pre-Arraignment Procedure, 1975 Proposed Official Draft, § 150.3, p 396; United States v Calandra, 414 US 338, supra, p 348, n 5.)

. The record demonstrates that the police were aware of the identity of Geraldine Neal independently of the defendant’s station house admissions. Detective Minerva testified at the Huntley hearing that he did speak to Miss Neal prior to the date of *671 defendant’s arrest. We choose, however, not to rely on our decision in People v Mendez (28 NY2d 94) to sustain the admissibility of Miss Neal’s testimony and the knife and the leather coat which were the "fruits” of the information she provided to the police.