THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
RICHARD KOCIK and KENNETH KOCIK, Appellants.

Fourth Department, July 13, 1978

## APPEARANCES OF COUNSEL

*George T. Dunn (Edward Hayes* of counsel), for appellants.

*Richard A. Hennessy, Jr., District Attorney (John Cirando* of counsel), for respondent.

## OPINION OF THE COURT

WITMER, J.

These cases against two brothers arise out of charges of rape, first degree, robbery, first degree, and subordinate crimes allegedly committed by them on October 9, 1975. Each of the defendants was interrogated by the police at the police station later that day and gave statements implicating themselves. After *Huntley* hearings to determine the voluntariness of such statements and court determinations denying defendants' motions to suppress the statements, defendant Kenneth Kocik pled guilty of sexual abuse, first degree, in violation of section 130.65 of the Penal Law in full satisfaction of the charges against him, and defendant Richard Kocik pled guilty of attempted rape in the first degree in violation of sections 110.00 and 130.35 of the Penal Law in full satisfaction of the charges against him. Kenneth was adjudicated a youthful offender and was sentenced to an indeterminate term with a maximum of four years. Richard was sentenced to an indeterminate term of seven years with a minimum of two years and three months. Both judgments were entered in October, 1976. Since the issues raised in the two appeals rest upon different treatment of the defendants at the police station, the cases will be considered separately.

### RICHARD KOCIK

On the early morning of October 9, 1975 Officers Bogardus

and Vinch of the North Syracuse Police Department had been asked to investigate the alleged rape and robbery of Susan Nielson, who told them that she had talked with Richard Kocik early the previous evening at Dee II's Restaurant on route 11. The officers spoke with a Bruce Lamb who told them that he had been with Wesley Cooper who might have been involved in the crimes against Ms. Nielson and that Richard Kocik had been with Cooper that night.

At 7:50 A.M., that day, without a warrant, the two police officers, in uniform, rapped on the door of the home of Mrs. Betty Kocik, mother of Richard Kocik, and asked to enter. On admittance they told Mrs. Kocik that they were investigating a crime which had occurred earlier that day and would like to talk with her son Richard. She told them that Richard had been home all the previous night and was upstairs in his bedroom. They assumed that the reply was an invitation to go upstairs, and they went up to a bedroom where Richard was lying on the bed. They called to him and he got up. They told him of their mission and asked him to get dressed and accompany them to the police station, and he said that he would.

Although the officers testified that Richard left with them voluntarily, he and his mother and sister testified that when he came downstairs his hands were handcuffed behind his back. They put him in the back of the police vehicle from which the doors could only be opened from the outside, and they drove to Cooper's home, picked him up and placed him in the police car with Richard, whence they drove to the police station, arriving at 8:30 A.M. Richard and Cooper were placed in separate rooms at the police station; the *Miranda* rights were read to Richard and he answered that he understood them and was willing to answer questions without an attorney. Officer Bogardus then questioned Richard for about an hour, following which Officer Vinch questioned him for another 10 minutes, but Richard did not admit his involvement in the crime. Two officers, O'Donnell and Zender, talked with Richard thereafter, and at 11:30 A.M. Officer Bogardus arrested Richard for rape, first degree.

During the questioning by Officers O'Donnell and Zender, Richard continued to deny his involvement in the crime, but finally agreed to make a statement, and they took him to another room for that purpose. While they were preparing a statement for him to sign, they received a telephone call from

a person (Mr. Beardsley) who said that he was Richard's attorney and asked them to cease questioning him and asked to speak on the telephone with Richard, which he was permitted to do. The questioning of Richard was then stopped, and he did not sign his statement.

Mrs. Kocik testified that the officers told her that Richard was under arrest when they brought him downstairs in handcuffs; that she called her attorney (Beardsley) and, with her daughter, went to the police station, arriving before 8:45 A.M. The woman clerk at the desk told her that her son was being questioned; that she could not go in but had to wait. She made no further effort at that time to see Richard, but was permitted to see him after the police finished questioning him around noon. She testified that Richard had a nervous condition and had been under mental health care in a psychiatric center and was not attending school or employed.

Defendant Richard Kocik testified in his own behalf and stated that the two officers threatened "to get me 25 years" on each count, and that as Officer Vinch questioned him he was "hitting" him in the chest with the officer's index finger. Defendant testified that he did not know what they were talking about when referring to his *Miranda* rights; that when they said that they were reading his rights to him, he made no response; and he was not asked whether he understood his rights. He testified that he told the officers that he did not wish to make a statement; and also that the officers refused his request to leave.

Upon that evidence the court found that defendant's oral statements to the police were voluntary and admissible upon trial.

Defendant contends that his statements should have been suppressed as the fruit of an unlawful detention; that the police lacked probable cause to take him into custody for interrogation; and that, although the police gave him the *Miranda* warnings, their insistent questioning of him for several hours without a break rendered the statements involuntary.

█ A confession obtained through detention without probable cause may be excluded as the fruit of the poisonous tree (see *Brown v Illinois,* 422 US 590; *Wong Sun v United States,* 371 US 471; *People v Oden,* 36 NY2d 382; and see *People v Martinez,* 37 NY2d 662; *People v Dunaway,* 61 AD2d 299, 303). The evidence does not support the court's finding that

the officers had probable cause to question defendant. They only had an indication from the victim that she had talked with defendant and Wesley Cooper earlier that morning or the previous evening at a restaurant, and the statement of Bruce Lamb that he had been with Cooper who he thought might have been involved in the crime, and that defendant was with him. They also found that defendant had been out of his home that night. The People concede that the officers lacked probable cause for an arrest, but contend that they had the right to "detain" defendant upon reasonable suspicion for questioning.

In *People v Morales* (42 NY2d 129, 135) the court reiterated its view expressed in an earlier *Morales* decision (22 NY2d 55) that "[l]aw enforcement officials may detain an individual upon reasonable suspicion for questioning for a reasonable and brief period of time under carefully controlled conditions which are ample to protect the individual's Fifth and Sixth Amendment rights." The court added (p 137), " 'a policeman's right to request information while discharging his law enforcement duties will hinge on the manner and intensity of the interference, the gravity of the crime involved and the circumstances attending the encounter' " (quoting from *People v De Bour,* 40 NY2d 210, 219; see, also, *People v Dunaway, supra,* p 302).

In *Morales* an extensive police investigation had established a "checkerboard square" of circumstantial evidence which pointed directly at the defendant. All investigative techniques suggesting the defendant as a suspect had been exhausted except for interrogation of the suspect himself. Under these circumstances the court found that even absent probable cause for arrest there existed reasonable suspicion for briefly detaining the defendant for questioning. The case, therefore, involved "a brief detention for interrogation based upon reasonable suspicion, where there was no formal accusation filed against defendant and where great public interest existed in solving a brutal crime" *(People v Dunaway,* 61 AD2d 299, 303, *supra;* cf. *Matter of Kwok T.,* 43 NY2d 213; *People v Stewart,* 41 NY2d 65; *People v De Bour, supra,* pp 213, 221).

Upon the facts in this case it can hardly be said that an extensive police investigation established a "checkerboard square" of circumstantial evidence pointing directly at defendant, nor can it be said that all investigative techniques, save interrogation, had been exhausted. Rather, as in *Brown v*

*Illinois* (422 US 590, *supra),* the detention was investigatory both in design and in execution and was embarked upon in the hope that something might turn up. In *Brown* the police officers investigating a homicide had been informed that the defendant was an acquaintance of the victim. Based solely upon this information the officers broke into the defendant's apartment, searched it and arrested the defendant at gunpoint. There was no investigation, and defendant was arrested without a scintilla of evidence casting suspicion upon him. The Supreme Court found that the impropriety of the arrest was obvious. Likewise, in *People v Martinez* (37 NY2d 662, *supra)* "the initial police conduct was predicated upon scanty information not even sufficient to establish grounds for suspicion" *(People v Morales,* 42 NY2d 129, 137, *supra;* see, also, *People v Anderson,* 42 NY2d 35).

■ The police conducted no investigation other than the questioning of the victim and Wesley Cooper's roommate, and they received insufficient information to create a reasonable suspicion that defendant had been involved in the crime. Furthermore, the circumstances surrounding the detention involved a substantial interference with defendant's freedom. Under these circumstances it cannot be said that the officers detained defendant upon reasonable suspicion for a reasonable and brief period of time. The detention of defendant therefore was illegal, in violation of his Fourth Amendment rights.

In *Brown v Illinois* (422 US 590, *supra)* the court held that custodial statements made subsequent to an unlawful arrest were subject to the exclusionary rule of *Weeks v United States* (232 US 383; see *Wong Sun v United States,* 371 US 471, *supra).* Where an oral statement follows an illegal arrest the court stated that *Miranda* warnings *"alone* and *per se,* cannot always make the act sufficiently a product of free will to break, for Fourth Amendment purposes, the causal connection between the illegality and the confession" (422 US 590, 603). The court (pp 603-604) deemed three factors, in addition to the *Miranda* warnings, to be relevant in determining whether the confession was obtained by exploitation of an illegal arrest, to wit, (1) "[t]he temporal proximity of the arrest and the confession"; (2) "the presence of intervening circumstances"; and (3) "particularly, the purpose and flagrancy of the official misconduct". As a result of this holding, the Court of Appeals in *People v Martinez* (37 NY2d 662, 668, *supra)* held "that in addition to the dictates of *Miranda* and

the standard of voluntariness, the controlling consideration for determining the admissibility of 'verbal' evidence obtained pursuant to claimed illegal police conduct is whether law enforcement officers acted in good faith and with a fair basis for belief that probable cause existed for an arrest." Thus, "illegality, if any, of a detention is only one of the factors to be considered on the issue of voluntariness" *(People v Johnson,* 40 NY2d 882, 883; and see *People v Taylor,* 16 NY2d 1038; *People v Hocking,* 15 NY2d 973). The question, then, is whether there were sufficient circumstances intervening between the illegal arrest and the confession to attenuate the confession and remove the tainted effect of the arrest.

■ It was established that the *Miranda* warnings were properly given to defendant. However, it is clear that the confession was made as a result of police exploitation of the illegal arrest. Defendant was detained at about 8:00 A.M. and confessed less than two and one-half hours later. Defendant arrived at the police station at about 8:30 A.M., and at various times during the next two hours he was questioned by Officers Bogardus, Vinch, O'Donnell, Zender and Lisi. Thus, during the entire two and one-half hour period defendant was continually under police custody and there was no intervening hiatus during that period. The purpose of detaining defendant was to question him regarding the rape incident. At no time did the police waver from this avowed purpose. The lack of reasonable suspicion was clear, and it cannot, therefore, be said that the police officers acted in good faith (cf. *People v Martinez, supra).* The People did not introduce any evidence "which would indicate that the circumstances under which the statement was given were so attenuating as to make it admissible" *(People v Burley,* 60 AD2d 973, 974). Defendant's confession should therefore be suppressed as having been produced by police exploitation of an illegal arrest in violation of defendant's Fourth Amendment rights (see *People v Stewart,* 41 NY2d 65, *supra).*

We find no merit in defendant's other contentions.

### KENNETH KOCIK

While Mrs. Kocik was at the police station waiting to see her son Richard, an officer asked her to go home and get her other son, Kenneth, and bring him to the station for questioning. Kenneth was 16 years old and a 10th-grade student in high school. Mrs. Kocik and her daughter returned to her

home at about 10:00 A.M. and awakened Kenneth. She then telephoned to her attorney, Beardsley, who told her to accompany Kenneth to the police station. He asked to speak with Kenneth on the telephone and, while Kenneth spoke with him, Mrs. Kocik listened on an extension phone. Beardsley told Kenneth that he, Beardsley, could not go the station with him, and advised Kenneth to say nothing to the police without counsel being present and to have his mother present during any questioning.

Mrs. Kocik and her daughter then returned to the police station with Kenneth, arriving at about 10:30 A.M. An officer asked Kenneth to come to an inner room, and Mrs. Kocik asked Chief Newman whether she could go in with her son. He replied, "No", adding that Kenneth was a big boy now and that it was against their policy to permit a parent to be with a child during questioning. As Kenneth left with the officer, Mrs. Kocik cautioned him not to say or sign anything. Kenneth testified that he heard his mother say to the officer that attorney Beardsley told her to go in with Kenneth so that officers "could not pressure him into signing or saying anything". In reply to her questioning as to when she could see her son, Chief Newman told her that she would have to wait. She did that, but on six to eight occasions she asked the lady officer at the desk for permission to see her son Kenneth. It was over an hour before she was told to go downstairs where she could see both of her sons.

Officer Bogardus testified that he took defendant Kenneth Kocik into an interrogation room at the police station at about 10:45 A.M., read to him his *Miranda* rights, and defendant said that he understood them. He asked defendant whether he was willing to answer questions without an attorney being present, and defendant replied, "No, my mother told me not to say anything"; and the officer testified that he had heard defendant's mother say that to defendant as defendant was led away for questioning. Nevertheless, Officer Bogardus proceeded to question defendant. First he advised defendant that the police were investigating a robbery and rape that had occurred on Church Street earlier that morning, and that they did not need his testimony because Wesley Cooper had already made a statement to the police and defendant's brother, Richard, was talking to the police at that very moment. Officer Bogardus told defendant that although he could not make a promise to him, it would probably be to

his advantage to tell his side of the story, as the court would consider that. Defendant testified that Officer Bogardus got "mad" during the questioning, declared that defendant was under arrest, that the charges against him were not little but were "25 years a piece"; that when defendant repeated that he would not talk without his lawyer being present, the officer said that, "If you clam up like your lawyer said, I'm going to make sure the D.A. and the courts come down on you hard". Officer Bogardus denied making such statements. Defendant testified that the officer then took him to another room and promised that if he would tell what happened and sign a statement, he would "see to it that the court and D.A. take it easier on you, you won't get all the time for these charges". Defendant then agreed to make a statement.

At about 11:00 A.M. Officer Bogardus called in Officer O'Donnell to take defendant's statement. Officer O'Donnell again read to defendant his *Miranda* rights, defendant signed the form indicating that he understood his rights, and after his statement to the police in affidavit form was typed he read it and signed it. Officer O'Donnell testified that defendant did not say to him that he did not want to talk or that he wanted a lawyer; and that the statement was completed at about 11:50 A.M. Defendant testified that he was scared at the time because of what Officer Bogardus had said, and he did not understand his rights.

Attorney Beardsley testified that Mrs. Kocik telephoned to him twice on the morning of October 9, 1975, first at 9:45 A.M. regarding her son Richard and again before 10:30 A.M. regarding Kenneth. He confirmed that he also talked with Kenneth and advised him to say nothing and sign no statement without his lawyer being present. He testified that about 15 minutes after the second call, he telephoned to the police station and told them that he was a lawyer representing Richard and Kenneth Kocik and that he did not want either of them questioned without an attorney being present.

The police testified that although they had received attorney Beardsley's call shortly after 10:30 A.M. and because thereof they ceased questioning Richard, the attorney had not mentioned Kenneth nor did they, because they had not yet started to question him; that although Kenneth said that his mother told him not to say anything, he did not say that he wanted a lawyer present, and they did not relate attorney Beardsley to Kenneth.

The hearing court concluded that beyond a reasonable doubt defendant had knowingly and voluntarily waived his constitutional right to remain silent; that an attorney had not been requested by or for Kenneth; and so Kenneth's written statement was admissible. Upon that ruling Kenneth pled guilty to a lesser crime. On this appeal he contends that his confession should have been suppressed as involuntary on the grounds, first, that it was the result of incessant importunity and coercive interrogation after he had informed the police that he wished to remain silent and, second, that the confession was obtained after the police knew that an attorney had entered the proceeding in his behalf.

In *Miranda v Arizona* (384 US 436, 473-474) the Supreme Court stated: "[o]nce warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise." "The avowed purpose of the *Miranda* rules is to restrict 'custodial interrogation' which the Supreme Court found to be inherently coercive" *(People v Kaye,* 25 NY2d 139, 143). It is presumed that custodial questioning denies an individual the power to exercise his privilege to remain silent, and any statement obtained in the course thereof must be excluded unless the People demonstrate that a knowing and intelligent waiver has been made *(Garner v United States,* 424 US 648, 657). Moreover, "[i]f the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel" *(Miranda v Arizona, supra,* p 475).

The police acknowledge that when they first interrogated defendant he said that he wished to remain silent. "In view of *Miranda,* the police were legally foreclosed from interrogating defendant once he insisted upon asserting his right to remain silent" *(People v Bowers,* 45 AD2d 241, 247). It is of no consequence that defendant's refusal to talk was based upon his mother's direction. He need only indicate in "any manner"

that he wished to remain silent in order to invoke his Fifth Amendment privilege.

Defendant having invoked his privilege against self incrimination, there remains the question of the legal effect of the success of the police in obtaining his subsequent waiver of his right to remain silent. In *People v Buxton* (44 NY2d 33, 37) the Court of Appeals wrote, "[i]n this respect, it is recognized that '[a]ny statement given freely and voluntarily without any compelling influence is, of course, admissible in evidence' *(Miranda v Arizona,* 384 US 436, 478, *supra).* Moreover, that a suspect has once asserted his right to remain silent does not, per se, prohibit his later being asked to speak upon reiteration of the requisite warnings, provided that the subsequent statement is not the product of 'continued importunity or coercive interrogation in the guise of a request for reconsideration' *(People v Gary,* 31 NY2d 68, 70)."

Defendant's confession was by no means a spontaneous admission. The record shows that defendant confessed only after incessant interrogation by the police, despite his expressed desire to remain silent. "[O]nce the defendant has asserted his right, the People must respect it and a subsequent waiver of that right is ineffective where, as here, it is obtained only after continued and unbroken harassment of the defendant" *(People v Jackson,* 41 NY2d 146, 152). After defendant invoked his privilege to remain silent, there was no such break "in the interrogation that the defendant may be said to have returned, in effect, to the status of one who is not under the influence of questioning" *(People v Chapple,* 38 NY2d 112, 115). Considering the "totality of the circumstances" *(People v Anderson,* 42 NY2d 35, 38, *supra),* "it cannot be said that the People have met their burden in establishing a knowing, willing and voluntary waiver of his rights" *(People v Jackson, supra,* p 153; see, also, *Johnson v Zerbst,* 304 US 458, 464; *People v Ramos,* 40 NY2d 610, 618). Accordingly, defendant's confession should have been suppressed.

The confession should also have been suppressed because the police had knowledge that defendant wished the presence of his mother who had sought to be present with him during his interrogation, and that the family attorney had directed that no questioning of defendant proceed in the absence of an attorney. The facts that defendant's mother sought to be with him during the questioning and that defendant wished her

presence are important considerations on the question of voluntariness of his confession *(People v Hocking,* 15 NY2d 973, *supra; People v Taylor,* 22 AD2d 524, mod 16 NY2d 1038, *surpa).* Moreover, "[o]nce an attorney enters the proceeding, the police may not question the defendant in the absence of counsel unless there is an affirmative waiver, in the presence of the attorney, of the defendant's right to counsel *(People v. Vella,* 21 N Y 2d 249). There is no requirement that the attorney or the defendant request the police to respect this right of the defendant" *(People v Arthur,* 22 NY2d 325, 329). This rule is "grounded in this State's constitutional and statutory guarantees of the privilege against self incrimination, the right to the assistance of counsel, and due process of law" *(People v Hobson,* 39 NY2d 479, 483).

Although there is some dispute concerning the knowledge that the police had as to the extent of attorney Beardsley's representation of the two brothers, Officer Newman acknowledged that "Mrs. Kocik's attorney" had called that day and Officers O'Donnell and Zender acknowledged that the attorney directed that the questioning of Richard cease. At the request of the police Mrs. Kocik later brought Kenneth to the police station, and the police knew that she was waiting in the station seeking to be with Kenneth. Under such circumstances, the contention by the officers that they did not know that an attorney had entered the proceeding in behalf of Kenneth is naive and a mockery of his right to counsel. The finding of the hearing court giving credence to such contention is contrary to the weight of the evidence and contrary to law (see *People v Pinzon,* 44 NY2d 458).

■ In *People v Arthur (supra,* p 329) the court wrote, "once the police know or have been apprised of the fact that the defendant is represented by counsel or * * * an attorney has communicated with the police for the purpose of representing the defendant, the accused's right to counsel attaches; and this right is not dependent upon the existence of a formal retainer." (See, also, *People v Buxton,* 44 NY2d 33, 37, *supra.)* The court re-enforced its statement of that principle in *People v Ramos* (40 NY2d 610, 617-618, *supra)* wherein it wrote, "[i]f, in fact, the prosecution was in doubt as to whether an attorney had entered the proceeding, the burden should rest squarely on it to insure that the defendant's right to be represented by counsel be protected. The ambiguity of the lawyer's statement or the manner in which the defendant's

attorney went about representing his client cannot be seized by the prosecution as a license to play fast and loose with this precious right. A defendant's right to counsel cannot be made to depend on whether in the sole judgment of the prosecution there has been sufficient activity and conduct of a proper character so as to compel a conclusion that the lawyer has entered the proceedings. Nor can we agree with the prosecutor that the defendant has an affirmative burden to point out to the prosecution that an attorney has entered the proceedings on his behalf. To hold otherwise would violate our prior holdings and seriously undermine this constitutionally guaranteed right."

The police acknowledge that they knew that an attorney represented Richard and had requested them not to question him further. Knowing that the events for which they sought to question Kenneth arose in the same incident as to which they had questioned Richard, and knowing of Mrs. Kocik's desire to accompany Kenneth and protect him, and that her attorney had called with respect to Richard, the police should have refrained from questioning Kenneth *(People v Coleman, 42 NY2d 500, 507)*, and for this reason also his statement should have been suppressed *(People v Burley, 60 AD2d 973, supra)*.

Since in each case the confession was "a likely factor which might have induced the plea and might have affected substantially a verdict upon a trial" *(People v Ramos, supra, p 619; People v Burley, supra)*, each judgment should be reversed, the pleas vacated and the statements suppressed.

MARSH P. J., HANCOCK, JR., and SCHNEPP, JJ., concur; DENMAN, J., not participating.

Judgments unanimously reversed, on the law and facts, pleas vacated and statements suppressed and matter remitted for further proceedings upon the indictment.