OPINION OF THE COURT
Edward A. Sheridan, J.
Defendants Anthony Malatesta and Shannon Malatesta, charged in two indictments with illegal possession of a vehicle identification number and other crimes arising from defendants’ possession of stolen property, move to suppress physical evidence. Defendant Anthony Malatesta also moves to suppress oral statements made to police officers.
A combined Mapp/Huntley hearing was held before the court on October 8, 1998. The People called Wayne Holmes, New York State Police Officers Nicholas Georgeadis and John J. Ogden, and Investigator Gary Kelly. The defendants called Shannon Malatesta and William Mahan. Based upon the credible evidence adduced at the hearing, the court makes the following findings of fact.
Findings of Fact
During the first week of December 1997, Thomas Mahan appeared at the State Police Sand Lake substation, requesting police assistance in retrieving a 1984 red Dodge pickup truck. Mahan claimed that six months before he had loaned the truck to his grandson, defendant Anthony Malatesta, who had refused to return it and had threatened him. Mahan was told by Troopers Georgeadis and Ogden that he could either swear a complaint and have Anthony Malatesta arrested, or tow the truck in which case the Troopers would provide “civil standby” to keep the peace. Mahan requested assistance. At that time, Troopers Georgeadis and Ogden were aware that Anthony Malatesta was a suspect in several open burglary investigations.
On December 6, 1997, Mahan arranged for towing service. Between 3:30 and 4:00 p.m., tow truck operator Wayne Holmes and Troopers Georgeadis and Ogden arrived at the Mahan farm in West Sand Lake. Mahan introduced Holmes to the Troopers and the four of them then left for the Malatesta residence on Mammoth Springs Road, North Greenbush, arriving at about 4:00 p.m. Mahan proceeded first in his vehicle. The two Troopers followed in a marked State Police vehicle and Holmes was behind them in his tow truck. Mahan entered the left or east entrance of the semicircular driveway followed by *314 the Troopers’ vehicle. Holmes entered the right or west entrance. Each entrance was posted with a “no trespassing” sign and a second “no trespassing” sign was posted halfway up each driveway. A trailer residence was set back approximately 150 feet from Mammoth Springs Road. Mahan parked about 75 feet from the left side of the trailer. The Trooper car parked immediately behind Mahan’s vehicle, and Holmes’ truck was nearby. Standing near his vehicle with Holmes and the Troopers, Mahan pointed toward a wooded area 75 to 100 feet behind the trailer, indicating what appeared to be the front fender of a partially obscured red truck, stating in words to the effect, “That’s my truck.” The truck, although visible from this location near the trailer, was not visible from Mammoth Springs Road.
Mahan then handed Holmes a vehicle title for his 1984 Dodge truck. Holmes, who had serviced the Mahan vehicle previously and was familiar with its appearance, proceeded toward the truck, which generally resembled the Mahan vehicle as he remembered it. Mahan followed, accompanied by Trooper Georgeadis who had been directed by Trooper Ogden to assist Mahan, who walked with the aid of a walker. As Holmes, Mahan and Trooper Georgeadis made their way to the truck, Trooper Ogden proceeded to the trailer and knocked on the door. A female, identifying herself as Shannon Malatesta, answered and Trooper Ogden apprised her that the Troopers were there to assist in retrieving Thomas Mahan’s truck. Shannon Malatesta indicated she would contact her husband, the defendant Anthony Malatesta, who was not home at the time.
Holmes approached the partially obscured vehicle, which he believed to be a 1984 or 1985 Dodge pickup truck. The vehicle bore no license plate, or registration or inspection stickers. At the time, Mahan and Trooper Georgeadis were about 15 feet behind Holmes. Holmes observed that the truck had a black stripe which he knew Mahan’s truck did not have, and that the vehicle generally looked “rougher” than Mahan’s. Holmes visually inspected the dashboard through the windshield to check if the vehicle identification number (VIN) matched Mahan’s title certificate. He observed that the dashboard VIN plate was missing and that metal shavings were present. Holmes immediately told Trooper Georgeadis of his findings. Holmes then proceeded to open the driver’s door and check the doorjamb’s VIN tag, which was present and did not correspond to Mahan’s vehicle title. (A later title and registration check after the vehicle had been towed to the State Police substation disclosed that *315 the vehicle was titled and registered to the defendant Anthony Malatesta.) Holmes apprised Trooper Georgeadis, who then approached and visually inspected the dashboard area and doorjamb VIN tag for himself. Trooper Georgeadis then informed Trooper Ogden of the missing VIN plate, and thereafter Ogden also made a visual inspection of the dashboard.
Shortly after 4:00 p.m., Trooper Ogden telephoned Bureau of Criminal Investigation (BCI) Investigator Edward Gertler to report the missing VIN plate, using Holmes’ cellular telephone. Twenty minutes later Gertler called back with instructions to “stand by.” Within a few minutes, BCI Investigator Gary Kelly, assigned to the Schodack barracks and to the Sand Lake substation, called Trooper Ogden back and discussed the matter with him. Investigator Kelly knew at the time that Anthony Malatesta was a suspect in several ongoing burglary investigations, about which Kelly and Ogden had had previous discussions. Earlier in the week, Investigator Kelly had also been informed by Trooper Ogden of Thomas Mahan’s request for assistance in retrieving his truck. Kelly told Ogden to continue to “stand by.” Kelly then telephoned Investigator Gertler and discussed the matter further with him. Thereafter, Investigator Kelly called Trooper Ogden again and told him “to have a clear understanding of your reasons for being there” and to seize the truck.* [1] Thereafter, at about 6:00 p.m., Trooper Ogden directed Holmes to tow the truck to the East Greenbush State Police station.
While the officers were on the premises sometime between 4:30 and 5:00 p.m., Anthony Malatesta telephoned his residence and spoke with Trooper Ogden. During the phone call, Malatesta made a statement to the effect that Thomas Mahan had given him the disputed truck and that he was not giving it back. Malatesta demanded that the Troopers leave the premises. About 20 minutes later, Anthony Malatesta arrived home and again demanded that Mahan, Holmes and the Troopers leave immediately. Responding to Malatesta’s inquiry why the Troopers were there, Trooper Georgeadis explained they were there at Thomas Mahan’s request for “civil standby” because Mahan had been threatened. Anthony Malatesta demanded to know why his truck was being towed and Trooper Georgeadis replied that the VIN plate was missing, which is a *316 crime. Anthony Malatesta then stated that the VIN plate had fallen off and that it was probably in the glove box. At the time, the defendant was not under arrest nor was he restrained in any way.
Three days later, on December 9, 1997, BCI Investigator Kelly applied to the Poestenkill Town Court for a warrant to search the Malatesta premises for the missing VIN plate and the tool used to remove it. A copy of the search warrant affidavit and the search warrant were introduced into evidence at the hearing.
At about 11:00 a.m. on December 9, Investigator Kelly and four other State Police Troopers arrived at the Malatesta residence to execute the search warrant and an arrest warrant for Anthony Malatesta. Anthony Malatesta, who was present, was informed he was under arrest and informed of the purpose for the search. The defendant advised the Troopers that the VIN plate was on the dresser in his bedroom.
The search commenced in the bedroom of the residence without result, and then progressed to outbuildings. In a red shed to the rear of the trailer, Investigator Kelly observed a security alarm system, certain electric supplies, and coins and collectibles that he knew to have been stolen in several unsolved area burglaries. The search was suspended and the premises secured.
Investigator Kelly then returned to the Poestenkill Town Court with an affidavit seeking amendment of the search warrant, authorizing search and seizure of the enumerated stolen property and other stolen property, which application the court granted. A copy of the affidavit and amended warrant were introduced into evidence at the hearing. Investigator Kelly then returned to the residence at about 5:30 p.m. and resumed the search with four other Troopers. Stolen property was seized from the trailer and the outbuildings located on the premises. The missing VIN plate was ultimately found in the bedroom, and seized.
Conclusions of Law
The threshold question on this motion to suppress evidence is whether the police conduct on December 6, 1997 constituted a search subject to constitutional protections. If so, the dispositive question is then whether the warrantless search violated defendant’s constitutional protection from unreasonable search and seizure.
Defendants argue that the Troopers’ warrantless entry onto their real property and the investigation of the red truck were *317 unlawful and not justified by any exception to the search warrant requirement. The People do not contest defendants’ standing to challenge the police conduct in this case. Nor do the People dispute that they bear the initial burden of demonstrating the propriety of the police conduct in the first instance (see, People v Berrios, 28 NY2d 361, 367-368).
The inquiry into whether there was a search in this case must be cast in terms of the court’s findings of fact: Did the State Troopers conduct a search when they entered onto defendants’ property via a driveway posted with “no trespassing” signs, and then proceeded some 75 to 100 feet from the driveway to a wooded area and visually inspected the dashboard and dooxjamb of the suspect vehicle for the YIN plates?
Analysis of this question must begin with the fundamental premise that “the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection * * * But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected” (Katz v United States, 389 US 347, 351). The question is whether the police intruded into an area in which the defendant had a legitimate expectation of privacy (see, Katz v United States, supra, 389 US, at 361 [Harlan, J., concurring]; People v Farenga, 42 NY2d 1092, 1093; People v Doerbecker, 39 NY2d 448, 452; see also, People v Kozlowski, 69 NY2d 761, 763, rearg denied 69 NY2d 985). This question does not turn on the nature of the place or the object that may be involved, but on “whether the government’s intrusion infringes upon the personal and societal values protected by the Fourth Amendment” (Oliver v United States, 466 US 170, 182-183; see, 1 LaFave, Search and Seizure § 2.1 [d], at 389-393 [3d ed]).
The People assert that the police officers’ inspection of the. truck and its missing YIN plate was a limited and permissible intrusion, and they rely on cases in which courts have held that brief investigations or inspections of vehicles located in driveways did not constitute a search subject to constitutional protection (see, People v Crapo, 103 AD2d 943, 944, affd 65 NY2d 663; People v Warmuth, 187 AD2d 473, lv denied 81 NY2d 894; People v Lewis, 162 AD2d 760, lv denied 76 NY2d 894; People v Salamino, 107 AD2d 827; see also, People v Kozlowski, supra; People v Maltese, 149 AD2d 626, lv denied 74 NY2d 743; People v Smith, 109 AD2d 1096). This reliance is misplaced.
In each of the cases cited by the People, the defendants had not manifested a legitimate expectation of privacy in the places *318 or items at issue because the vehicles were located near the entrance of driveways presumptively, at least, open to the public and the police were able to view nothing more than “would be visible to the casual caller” (see, People v Warmuth, supra, 187 AD2d, at 474). Because the police action in those cases “was no more intrusive an event than ordinarily occurs during the daily incidents of life in an urban neighborhood by, e.g., a paperboy, garbage collector or door-to-door salesman” entering upon the premises, it was not deemed a “search” (People v Crapo, supra, 103 AD2d, at 943). However, police entry into a private driveway is not uniformly permitted as a matter of law (see, People v Gravano, 67 AD2d 988, affd 49 NY2d 1016). Moreover, in none of the cases cited by the People did the defendant manifest an intention to exclude the public from the area intruded upon by the law enforcement personnel as by the posting of signs or erection of barriers (see, People v Kozlowski, supra, 69 NY2d, at 763; People v Smith, supra, 109 AD2d, at 1098-1099; People v Crapo, supra). Nor did the police officers in the cited cases stray from the area of the property that was presumptively open to invitees or visitors to the premises.
In contrast, defendants here had four “no trespassing” signs — one posted at the entrance to each driveway and another posted halfway up each driveway (compare, People v Crapo, supra). Thomas Mahan, William Holmes, and Troopers Georgeadis and Ogden either failed to notice the signs or chose to ignore them. (At the hearing, Trooper Georgeadis testified that he could not recall whether there were “no trespassing” signs posted on defendants’ property.) Either way, by posting “no trespassing” signs along the driveways, defendants clearly manifested some expectation of privacy in the premises, an expectation recognized as reasonable as a matter of State constitutional law (NY Const, art I, § 12; see, People v Scott, 79 NY2d 474, 491).[2]
This is not to announce a new rule that law enforcement personnel may never enter private property if it has been posted with “no trespassing” signs. Quite clearly, and appropriately, the police may have occasion to enter private property, posted or unposted, without a warrant for a variety of *319 purposes other than the arrest of a suspect or the seizure of the fruits, instrumentalities or evidence of crime. The police have “complex and multiple tasks to perform in addition to identifying and apprehending persons committing * * * criminal offenses” (ABA Standards for Criminal Justice § 1-1.1 [b] [2d ed 1980]). By design or default, society has come to expect the police to “reduce the opportunities for the commission of some crimes through preventive patrol and other measures”; “aid individuals in danger of physical harm”; “create and maintain a feeling of security in the community”; and to “resolve conflict” (id., § 1-2.2 [b], [c], [i], [g]). In such situations, however, the pertinent inquiry is whether there is some compelling urgency, exigency or other justification that would permit a warrantless entry by police into property that is posted (see generally, 3 LaFave, Search and Seizure § 6.6 [3d ed]; see also, People v Scott, supra, 79 NY2d, at 489 [there exists “the general notion that the only legitimate purpose for governmental infringement on the rights of the individual is to prevent harm to others”]; People v Reilly, 195 AD2d 95, 100).
In the case at bar, the People do not rely on the well-established warrant requirement exceptions of consent, or search incidental to a lawful arrest, nor do they argue that there was an exigent circumstance present. They contend that the Troopers’ warrantless entry onto defendants’ property was justified by their performance of a “civil standby” or peacekeeping function, and that the Troopers, therefore, were lawfully on defendants’ property when they observed the missing YIN plate. They cite that part of Executive Law § 223 (1) that provides members of the State police with the general duty and power “to prevent and detect crime.”
Where the police enter private property in situations where a breach of the peace or interpersonal confrontation is foreseeable, there usually exists specific statutory authorization for, or lawful process to support, the police entry. For example, police may lawfully enter premises to serve a valid arrest warrant (see, CPL 120.80), or may enter private premises to aid a person in securing the protection afforded by an order of protection (see, Family Ct Act § 168 [1]). The Sheriff may be authorized to enter and search private premises and to seize a vehicle (see, CPLR 7102 [d]). In the absence of such or similar authority to enter private property, police personnel may be liable to civil or criminal trespass (see generally, People v Gleeson, 36 NY2d 462).
As just noted, CPLR article 71 provides a process by which Mahan could have (and probably should have) obtained a court *320 order authorizing recovery of his truck believed to be at the Malatesta residence. That article serves several purposes, including providing judicial authorization to the Sheriff, a member of the law enforcement community, to go onto an individual’s property to seize a chattel on behalf of a claimant (after the claimant has followed statutory procedures that are intended to protect the due process and property rights of the party who is alleged to be in wrongful possession of the chattel). That article specifically contemplates motor vehicles as among the chattels that are subject to recovery (see, CPLR 7102 [d] [2]). Manifestly, a substantial purpose of article 71 is to provide a court-supervised remedy rather than self-help to wholly avoid the “potential confrontation” that the Troopers anticipated might occur when Mahan engaged in unauthorized self-help. That purpose is manifested, too, in the Uniform Commercial Code, which permits a secured creditor to take possession of collateral without judicial process only when doing so will not cause a breach of the peace (see, UCC 9-503).
In this case, the existence and disregard of a specific statutory procedure that would have authorized police entry onto defendants’ property to recover the Mahan truck leads to the conclusion that Executive Law § 223 does not provide a valid exception to the warrant requirement in the “replevin” situation presented here. But in any event, whatever the authority provided by Executive Law § 223 or general police powers to enter private property in a “civil standby” status, the court is unconvinced that it can validate what ensued thereafter — the search of defendants’ “posted” property under the circumstances presented here. Thus, the “civil standby” performed by the Troopers in this case does not constitute a cognizable exception to the search warrant requirement nor can it validate the subsequent inspection and seizure of the suspect truck.
In addition to posting their property, the defendants here manifested an expectation of privacy with respect to the truck itself by parking it in a spot that was not visible from the road and only partially visible from their driveway. The photographs offered at the hearing establish that there was ample area for the truck to be parked in a more accessible location, had defendants not desired privacy with respect to it.
Even assuming that the State Troopers’ initial presence upon defendants’ posted property was legal because the driveway is presumptively open to the public, or assuming the Troopers’ initial “civil standby” role authorized a warrantless entry onto the premises, they exceeded the scope of that function when *321 they proceeded from the driveway to the wooded area and the partially obscured truck. This is particularly so in the absence of Anthony Malatesta or any other apparent potential breach of the peace. That is to say, when they went to the truck, the Troopers placed themselves in a location on the property inconsistent with the stated reason for their presence. Even if the posted “no trespassing” signs did not override the implied invitation for public access generally provided by a driveway, the signs clearly manifested a reasonable expectation of privacy in those areas of the property off the beaten path and not readily accessible to the public at large. If the police stray from those areas of private property presumptively open to the public, they proceed at their peril, and if they discover evidence of criminality, advertently or inadvertently, the admissibility of such evidence is subject to constitutional search and seizure scrutiny.
The People next contend that the Troopers were nevertheless entitled to observe the truck and the missing VIN plate because they were in “plain view.” However, this presupposes the police officer’s lawful presence in the partially wooded area where the incriminating observations were made. But, as discussed supra, the Trooper’s presence in a part of the posted property not even presumptively open to the public was not lawful and cannot validate the observation of the missing VIN plate, for it is axiomatic that the lawful presence of law enforcement personnel is a predicate to application of the “plain view” doctrine (see, Horton v California, 496 US 128, 136-137; People v Diaz, 81 NY2d 106, 110; People v Saurini, 201 AD2d 869; People v La Borde, 66 AD2d 803, 804-805).
Finally, the People contend that the search of the truck was lawful because it was conducted initially by Mr. Holmes, who was not acting as an agent of the police, and that the constitutional proscriptions against unreasonable search and seizure do not apply to private actors (see, People v Horman, 22 NY2d 378, 380, cert denied 393 US 1057). In essence, the People argue that because Holmes reached the truck and saw the dashboard first, at a time when Trooper Georgeadis was lagging 15 feet behind, the discovery of the missing VIN plate did not offend defendants’ right to be free of unreasonable search and seizure.
This is not a situation where a private individual conducted a search that revealed an instrumentality or indicia of crime, and then alerted law enforcement personnel (compare, People v Gleeson, supra; People v DeSantis, 59 AD2d 257, affd 46 NY2d *322 82, cert denied 443 US 912). Nor does the mere involvement of civilians insulate police conduct from constitutional scrutiny (see, People v Gleeson, supra, 36 NY2d, at 466). Here, although Holmes may not have been acting as an express agent of the police, Mahan had acted upon the advice of the Troopers who, rather than advising him to proceed pursuant to CPLR article 71, advised him to engage in self-help, with their assistance in keeping the peace. Given the facts of this case, the conduct of Holmes, Mahan and the Troopers was so contemporaneous and intertwined that the legality of the search cannot rest on the simple fortuity that Holmes walked faster than Mahan and Trooper Georgeadis. Indeed, if Holmes and Mahan had not been accompanied by the Troopers, but had called them to inform them of the missing VIN plate, defendants’ legitimate expectation of privacy in their real property (as discussed above) would have prohibited the Troopers from venturing far enough onto the property to inspect the truck without a warrant. That the Troopers were already on the defendants’ property when Holmes discovered the missing VIN plate cannot permit a different result.
In the final analysis, in assessing the law enforcement conduct at issue here, it must be asked whether permitting the police regularly to engage in this type of practice, limited by nothing more than “self-restraint by law enforcement officials” (United States v White, 401 US 745, 786 [Harlan, J., dissenting]), would require the people, to whom the State constitutional protections apply, to yield too much freedom at the cost of privacy. That is to say, would the police practice, if not subjected to constitutional restraints, encroach too much on the people’s constitutionally protected right to be “secure in their persons, houses, papers and effects” (NY Const, art I, § 12) or impose unreasonable burdens upon those who wished to maintain that security? In the circumstances presented by this case, the court concludes that the people’s sense of security would be unreasonably and unduly infringed were law enforcement officers, ostensibly performing a valid “civil standby” function, allowed to roam at will about posted private property, inspect objects on the property and seize evidence of suspected criminality.
For all the reasons stated, the court holds that the People have not borne their burden of establishing the legality of the Troopers’ conduct on December 6, 1997, when they conducted a warrantless entry onto and search of defendants’ property and seizure of defendant Anthony Malatesta’s truck. This conduct *323 led to the discovery of the missing VIN plate, which provided the information for the initial search warrant. The discovery of the stolen property during the execution of that search warrant led directly to the amended search warrant, which led directly to the search and seizure of the VIN plate and the stolen property evidence for which defendants are being prosecuted. In addition, the statements made by defendant Anthony Malatesta, while noncustodial and voluntary, were the direct product of the Troopers’ unlawful presence on his property and unlawful search of the red truck.
Accordingly, the court concludes that all of the physical evidence and statements sought to be offered in this case must be suppressed as the fruits of impermissible conduct by law enforcement personnel (see, Wong Sun v United States, 371 US 471; People v Martinez, 37 NY2d 662).[3]

. Penal Law § 170.70 (2) makes it a class E felony to possess a vehicle from which the VIN plate has been removed. Vehicle and Traffic Law § 423-a (1) provides that a State police officer shall seize and confiscate a motor vehicle from which a VIN plate has been removed.

. In this regard New York, as a matter of State constitutional law, no longer follows the Federal “open fields” doctrine as applied to lands outside the curtilage as set forth in Hester v United States (265 US 57) and reaffirmed in Oliver v United States (466 US 170, supra; see, People v Scott, supra).

. In light of this analysis, the court does not reach or decide defendants’ additional argument that the initial police entry was an unlawful pretext to search for evidence of Anthony Malatesta’s involvement in certain unsolved burglaries.