**UNITED STATES of America,**
**Appellee,**

v.

**Maxie THOMAS and Wilbur Wiggins,**
**Appellants.**

**No. 460, Docket 32102.**

United States Court of Appeals
Second Circuit.

Argued April 26, 1968.

Decided May 31, 1968.

**311**

Edward R. Cunniffe, Jr., New York City, for appellant Thomas.

James J. Sentner, Jr., New York City (Anthony J. Marra, The Legal Aid Society of New York, Harry C. Batchelder, Jr., Ara A. Shimshidian, New York City, on the brief), for appellant Wiggins.

Elkan Abramowitz, Asst. U. S. Atty. (Robert M. Morgenthau, U. S. Atty. for Southern District of New York, Pierre N. Leval, Asst. U. S. Atty., on the brief), for appellee.

Before HAYS, ANDERSON and FEINBERG, Circuit Judges.

FEINBERG, Circuit Judge:

Defendants appeal from convictions for unlawful possession of two cartons of chinaware, worth less than $100, knowing them to be stolen from an interstate or foreign shipment in violation of 18 U.S.C. § 659. Appellants were tried before Harold R. Tyler, Jr., J., sitting without a jury in the United States District Court for the Southern District of New York.[1] For the reasons given below, we affirm.

The following is what the trier of fact could have found, viewing the evidence in the light most favorable to the Government. On November 5, 1965, at approximately 7:10 P.M., Lieutenant George Matwijeczko of the New York Central Railroad Police, and two fellow railroad officers were routinely patrolling the railroad yards, which are located between Tenth and Twelfth Avenues and 30th and 32nd Streets in Manhattan. The officers observed appellants on the public street above the yard, each carrying a carton on his shoulder. The officers became suspicious because there was usually so little pedestrian traffic in that area at that hour, particularly on a Friday night. They got into their automobiles, one marked and one unmarked, and approached appellants at the corner of 32nd Street and Eleventh Avenue. Matwijeczko and one other officer were in plain clothes; the third officer was wearing a railroad police uniform. They did not purport to arrest defendants at that time; no officer drew his gun or frisked appellants. When the police arrived, Wiggins dropped his carton, started to run, and fell down. Matwijeczko helped him up and asked him where he had ob-

---

1. Each defendant was sentenced to one year, sentence suspended, and placed on probation for two years.

tained the carton. Wiggins replied that he found it at the corner of 30th Street. Matwijeczko said that he had just passed that corner and had seen no carton there. When asked if he had a bill for the carton, Wiggins replied that he did not. Matwijeczko then asked Wiggins whether he had stolen it; Wiggins answered in the negative and reasserted that he had found it.

Meanwhile, the other two railroad officers questioned Thomas, who was standing near the other carton. Thomas also claimed that he had found his carton, but on 31st Street. When it was pointed out that there was no 31st Street in that area, he said that it was on the corner. When he was told that he had been observed carrying the carton across that corner, Thomas said that it was "down a little further than that."

At this point, Matwijeczko asked whether the two would come down to the railroad office so that the ownership of the cartons could be determined. Wiggins answered that they would, and added that he did not have anything to hide. Each appellant picked up a carton, put it in the back of Matwijeczko's car, and accompanied the railroad police to their office.

At the office, Matwijeczko called FBI agent John M. Conlon. Conlon told him not to hold appellants for him since there was no evidence that an interstate crime had been committed. Matwijeczko then left the office, and with the aid of a man he found in the vicinity, located a trailer nearby, so parked that it could be entered. The cartons in that truck, which was in the building of Standard Hauling Company, had the same markings as those on the cartons carried by appellants. Matwijeczko called the president of Standard Hauling, who identified the cartons and then went to his office and produced a bill of lading to verify ownership. FBI agent Conlon was then called, and he formally placed appellants under arrest at 10:45 P.M.

Appellants moved under Fed.R.Crim.P. 41(e) to suppress the cartons, claiming they were seized in violation of the fourth amendment. After a hearing before Judge Charles H. Tenney, the motion was denied. United States v. Thomas, 250 F.Supp. 771 (S.D.N.Y.1966). The first claim on appeal is that this ruling was erroneous; appellants argue that they were unlawfully arrested by the railroad police and that the cartons should have been excluded as "fruits of the poisonous tree." See Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). However, whether the railroad police unlawfully arrested appellants is irrelevant to this issue because there was no search and seizure of the two cartons before the later arrest by agent Conlon, for which there was clearly probable cause.

At no time did the railroad police "seize" the cartons. Judge Tenney found that "Thomas and Wiggins each picked up a carton and placed it in the rear seat of the unmarked car." Thereafter, "[w]hen they arrived at the [railroad] office, Wiggins and Thomas carried the cartons into the office and set them on the table." 250 F.Supp. at 777. The judge also found that "they [Thomas and Wiggins] at all times handled the cartons." Id. at 793 n. 27. These factual findings, for which there was adequate support in the record, justify the conclusion that the railroad officers did not exercise dominion and control over the cartons. The cartons were merely in the possession of appellants while the investigation to determine ownership continued. Nor was there any search. Appellants were approached on a public street, where they had been carrying the packages on their shoulders. The clearly visible markings on the cartons enabled Lieutenant Matwijeczko to track down their origin. The observation of the markings in plain sight was not a search. Ker v. State of California, 374 U.S. 23, 43, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963) (opinion of Clark, J.); United States v. Barone, 330 F.2d 543 (2d Cir.), cert. denied, 377 U.S. 1004, 84 S.Ct. 1940, 12 L.Ed.2d 1053 (1964). It is true that at one point Matwijeczko did open one carton in the railroad office, without objec-

tion from appellants. However, he obtained nothing useful; if that was an illegal search, it bore no "fruit" whatsoever.

■ Appellants' second contention concerns their exculpatory statements when they were first accosted by the railroad police on the street. Appellants argue that the statements were inadmissible in evidence because the warnings required by Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), were concededly not given at that time and because the statements were "seized" after an illegal arrest. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Basic to this position is appellants' claim that they were arrested on the street corner. On the issue of when the arrest occurred, state law apparently furnishes the standard to be applied in the absence of a governing federal statute. Miller v. United States, 357 U.S. 301, 305, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958); United States v. Di Re, 332 U.S. 581, 589, 68 S. Ct. 222, 92 L.Ed.2d 210 (1948); United States v. Viale, 312 F.2d 595, 600 (2d Cir.), cert. denied, 373 U.S. 903, 83 S.Ct. 1291, 10 L.Ed.2d 199 (1963).[2] At the time these events took place, New York defined arrest as "the taking of a person into custody that he may be held to answer for a crime";[3] an arrest is effected by "an actual restraint of the person of the defendant, or by his submission to the custody of the officer." N.Y.Code of Cr.Proc. §§ 167, 171. Under New York law, approaching the appellants on a public street and making a few inquiries can be something less than an "arrest," People v. Rivera, 14 N.Y.2d 441, 252 N.Y.S. 2d 458, 201 N.E.2d 32 (1964), cert. denied, 379 U.S. 978, 85 S.Ct. 679, 13 L.Ed. 2d 568 (1965); People v. Hoffman, 24 A.D.2d 497, 261 N.Y.S.2d 651 (1965); cf. People v. Morales, 22 N.Y.2d 55,

290 N.Y.S.2d 898, 238 N.E.2d 307 (1968), and the precise time at which an arrest occurred is a question of fact. People v. Entrialgo, 19 A.D.2d 509, 245 N.Y.S.2d 850 (1963), aff'd, 14 N.Y.2d 733, 250 N.Y.S.2d 293, 199 N.E.2d 384 (1964).

■ In his comprehensive opinion on the motion to suppress, Judge Tenney found that there was no arrest while appellants were on the street corner; the judge went on to hold that arrest did not occur until FBI agent Conlon "formally" arrested appellants at 10:45 P.M. in the railroad office. We need not decide whether the latter finding was supportable or whether an arrest took place when appellants entered the police car. For it is clear that we deal here only with appellants' statements when they were first stopped; these were all made before they entered the police vehicle to be taken to the railroad police office. Appellants' statements after they arrived at that office were excluded at trial by Judge Tyler on the ground that they were of little probative value.[4] Therefore, when appellants were arrested is not significant on the issue here involved so long as the arrest did not occur during the street interchange. Judge Tenney's finding that it did not was amply supported by the record and apparently concurred in by Judge Tyler.[5]

Appellants argue that People v. Colletti, 33 Misc.2d 195, 223 N.Y.S.2d 948 (Queens Co.Ct.1962), requires a conclusion that the arrest occurred before the statements on the street were made. In *Colletti*, a policeman approached the defendant on a public street, took out his shield, and apparently told her to "come along with us." The County Court held, on a motion to suppress, that the arrest occurred when the defendant was first approached. However, in that case a policeman's testimony established that the

---

2. Cf. United States v. Vita, 294 F.2d 524, 530 n. 2 (2d Cir. 1961), cert. denied, 369 U.S. 823, 82 S.Ct. 837, 7 L.Ed.2d 788; 369 U.S. 866, 82 S.Ct. 1032, 8 L.Ed. 2d 85 (1962), which involved a "gloss" upon Rule 5, Fed.R.Crim.P.

3. The section was amended, effective September 1, 1967, to replace "crime" with "offense."

4. Trial Transcript, p. 190.

5. Id. at 189–190.

entire area was surrounded by the police and that the defendant was not free to go after she was first accosted. The court's conclusion that the defendant had been arrested when first approached was a finding of fact based upon the evidence before it; it does not require a similar finding in this case on materially different evidence. Nor does Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed. 2d 134 (1959), also cited by appellants, require a contrary result. The officers there followed a moving car and compelled it to stop, far more of an interference than approaching appellants, who were walking on the street. In addition, the Government there conceded that the arrest took place when federal agents first stopped defendants' car, 361 U.S. at 103, 80 S.Ct. at 171. Finally, it is significant that in Rios v. United States, 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960), the Court held that if policemen followed a taxi, took positions at its doors while it was stopped for a traffic light, and one identified himself, the actions did not necessarily constitute an arrest; the Court remanded for an evidentiary hearing on "when the arrest occurred." [6] In this case, of course, the evidentiary hearing has already been held.

In sum, we affirm the finding that appellants were not under arrest at the time the statements were made. Therefore, the argument that the statements were the fruit of an illegal arrest must fall.[7] See Fisher v. United States, 324 F.2d 775 (8th Cir. 1963), cert. denied, 377 U.S. 999, 84 S.Ct. 1935, 12 L.Ed.2d 1049 (1964).

This holding does not totally dispose of the *Miranda* issue since appellants argue that even if there had been no "arrest," at the time they made their statements, they had been deprived of their freedom of action in a "significant way." 384 U.S. at 444, 86 S.Ct.

1602. Judge Tenney found that there was no physical restraint, "either by guns, handcuffs, or otherwise" exerted on appellants, and that there was no frisk or search on the street. 250 F.Supp. at 779. Not only were appellants not in custody, but there were few restraints of any kind on them at that time. See Evans v. United States, 377 F.2d 535 (5th Cir. 1967). Appellants were approached on a public street, not questioned in the station house, see United States v. Knight, 395 F.2d 971 (2d Cir. 1968); People v. P., 21 N.Y.2d 1, 286 N.Y.S.2d 225, 233 N.E.2d 255 (1967), and they never suggested that they wanted to leave. See United States v. Knight, 261 F.Supp. 843 (E.D.Pa. 1966). Under these circumstances, the few questions asked appellants on the street to determine whether any crime had been committed were more in the nature of "on the scene" questioning as part of the fact-finding process than custodial interrogation. See United States v. Littlejohn, 260 F.Supp. 278 (E. D.N.Y.1966). Cf. United States v. Glover, 372 F.2d 43, 46 n. 4 (2d Cir. 1967); Wilson v. Porter, 361 F.2d 412 (9th Cir. 1966); United States v. Middleton, 344 F.2d 78, 83 (2d Cir. 1965). It is true that the officers involved were not regular police officers who generally make such investigations. However, they were appointed by the superintendent of state police under a New York statute which gives them the powers of policemen "for the preservation of order and of the public peace, and the arrest of all persons committing offenses upon the land of or upon property in the custody of or under control of" the railroad. N.Y.Railroad Law, McKinney's Consol.Laws, c. 49, § 88. Admittedly, these powers may be exercised only "upon the property or in connection with the property connected with or under the control of" the rail-

---

On remand, the district court found that there was only a routine interrogation, not amounting to an arrest, until after defendant had dropped a package recognizably containing heroin. United States v. Rios, 192 F.Supp. 888 (S.D.Cal.1961).

On this view of the case, there is no need to discuss whether, as the Government contends, there actually was probable cause for arrest before appellants went into the police car.

road. Id. However, the suspicious actions here were first observed by the policemen while they were on railroad property and appellants were on the street right above it. When there are activities so close to the land of the railroad which reasonably raise the likelihood that railroad property is involved—even though, in fact, it is not—railroad police are as much entitled under *Miranda* to engage in "on the scene" questioning as any other officers.

Appellants also argue that there was a failure of jurisdiction since the cartons, when taken, were not in interstate or foreign commerce.[8] The undisputed facts on this issue are as follows: L. Batlin & Sons, importers and exporters located in New York City, ordered a total of ninety cartons from Nagoya, Japan in late 1965. Sixty-seven of these were delivered by a Japanese vessel, the Brooklyn Maru, to a Brooklyn pier on October 29, 1965. These were picked up by Batlin's agent, Standard Hauling, on November 5, and taken to the Standard Hauling warehouse. No cartons were unloaded that day because of the lateness of the hour. Batlin already had orders for fifty-six of these cartons; 43 of the 56 had ultimate destinations outside New York state. The remaining eleven cartons, for which there were no orders, were to go to Batlin's warehouse in New York. The orders were to be filled by Standard Hauling and the cartons delivered to interstate truckers and carloading companies; normally the interstate shipments were the first taken off the truck. In fact, when the president of Standard Hauling identified the stolen cartons later that night, he brought a bill of lading for two cartons to Washington, D. C., which he had taken from the top of the pile of "interstate shipments" in the dispatch office.

Appellants maintain that when the cartons were taken, foreign commerce had come to an end as a matter of law and that "[t]here is not any evidence at all that either of the cartons" was in interstate commerce. However, the cartons had just been removed from the pier and were all together—not only in the original package, but as a single shipment. Cf. Brown v. State of Maryland, 12 Wheat. 419, 441–442, 6 L.Ed. 678 (1827); Anglo-Chilean Nitrate Sales Corp. v. State of Alabama, 288 U.S. 218, 225, 53 S.Ct. 373, 77 L.Ed. 710 (1933); Low v. Austin, 13 Wall. 29, 34, 20 L.Ed. 517 (1871). Moreover, the entire load was a shipment intended primarily for delivery outside of the state. It is true that 18 U.S.C. § 659 is a criminal statute to be strictly construed, but we must remember that the congressional intent in this statute to protect the flow of goods "is not to be hampered by technical legal conceptions." United States v. Berger, 338 F.2d 485, 487 (2d Cir. 1964), cert. denied, 380 U.S. 923, 85 S.Ct. 925, 13 L.Ed.2d 809 (1965). In some circumstances there may well be a gap between the end of foreign and the beginning of interstate commerce. However, we hold that on these facts Judge Tyler could properly find, as he did, that the cartons were "in interstate or foreign commerce" when they were removed from the trailer on the Standard Hauling premises. Cf. United States v. Schwartz, 150 F.2d 627 (2d Cir.), cert. denied, 326 U.S. 757, 66 S.Ct. 97, 90 L.Ed. 454 (1945).

The judgments of conviction are affirmed.

---

**8.** The information charged only an interstate shipment, but appellants raise no question of variance. See United States v. Schwartz, 150 F.2d 627 (2d Cir.), cert. denied, 326 U.S. 757, 66 S.Ct. 97, 90 L.Ed. 454 (1945). In its opening statement, the Government pointed out that on the issue of the nature of the commerce "it may very well be that the Government will be proving foreign commerce as well." Thus, appellants were adequately apprised that foreign commerce might be in issue.