**UNITED STATES of America, Appellee,**

v.

**Charlie TUCKER, Appellant.**

**No. 985, Docket 79–1068.**

United States Court of Appeals, Second Circuit.

Submitted May 15, 1979.

Decided Oct. 23, 1979.

---

George A. Farkas, Brooklyn, N. Y., for appellant.

Thomas D. Sclafani, Harvey M. Stone, Asst. U. S. Attys., Edward R. Korman, U. S. Atty., E. D. New York, Brooklyn, N. Y., for appellee.

Before OAKES and VAN GRAAFEI-LAND, Circuit Judges, and CARTER, District Judge.*

OAKES, Circuit Judge:

This is an appeal from a judgment of conviction entered on February 2, 1979, by the United States District Court for the Eastern District of New York, Henry Bramwell, Judge, after a jury trial, for three armed bank robberies, in violation of 18 U.S.C. §§ 2113(a), 2113(d), and 2. Appellant urges that the police lacked probable cause for detaining him prior to eliciting inculpatory statements and that certain statements introduced at trial were the inadmissible fruit of an unlawful arrest. For the reasons that follow, we reverse the judgment of the district court and remand the cause for proceedings consistent with this opinion.

The facts, briefly, are as follows. On April 17, 1978, two tall black males robbed the Chase Manhattan Bank, 3126 Avenue U, Brooklyn, New York. On April 25, two black males robbed the same bank; a bank employee testified at trial that she recognized the tall man who controlled the floor as the same in both robberies. A truck driver saw the robbers leave after the second robbery and was later able to describe the car in which they escaped, including its license plate. The following day, police on patrol spotted a car of a similar description, with a closely similar plate. (The witness had described the automobile as a blue Dodge Dart or a Nova with license plate number 552–CZZ or 352–CZZ; the automobile that appellant tried to enter was a rented blue Dodge Aspen with license plate number 552–ZCV.) According to testimony at the suppression hearing, the police saw appellant and another man unsuccessfully attempt to open the car's doors, engaged the two men in conversation as to who owned the car, and asked them (and a third man who had joined them) to come down to the station to determine who owned the car. Appellant was detained for several hours in a holding pen until agents of the Federal Bureau of Investigation arrived. The agents told him that he was under arrest for the April 25 robbery, at which he blurted out "All right, you got me." The agents immediately gave *Miranda* warnings to appellant and obtained a confession from him on the spot. They obtained a further confession the following morning, when they transported him to his arraignment.

Appellant was released on bail on April 27, 1978. On August 16, 1978, there was a robbery of a different bank in Brooklyn. Based on eyewitness testimony, the police arrested appellant for the robbery later that morning.

Appellant moved to suppress physical evidence and post-arrest statements concerning all three robberies. But with respect to the two April robberies, appellant explicitly limited the grounds for his motion to two issues, inadequate *Miranda* warnings and improper government influences to make the appellant talk, specifically disavowing any illegal arrest argument. During the December 11 hearing on the motion, how-

* Of the Southern District of New York, sitting by designation.

ever, the judge permitted questioning on the issue of illegal arrest over the Government's objection. Appellant raised the illegal arrest/poisonous fruit argument at the end of the hearing, and the court considered and summarily rejected it.

■ Under Fourth Amendment principles recently restated in *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), the Government has not on this record, satisfied its burden of proving by a preponderance of the evidence, *see Brown v. Illinois*, 422 U.S. 590, 604, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), that the confessions on April 26 and April 27, 1978, were admissible and were not the fruit of an illegal arrest. First, the detention of appellant in the holding pen apparently did constitute an "arrest," requiring a finding of the usual degree of probable cause, not the lesser degree permitted by the stop-and-frisk cases such as *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and progeny. As in *Dunaway*, the police *told* the appellant to come down to the station for questioning, leaving him with the impression that until they were through with him, he was not free to leave. *See Dunaway, supra,* 442 U.S. at 208, 99 S.Ct. at 2254.

The dissent argues that *Dunaway* should not be applied retroactively because it decides a new question of law and broadens the exclusionary rule, and that the policy of deterrence said to underlie the exclusionary rule[1] would not be served by applying it retroactively while the administration of justice would be unduly burdened by such application. But *Dunaway* does not purport to expand Fourth Amendment protections beyond the contours established in prior cases. Thus, although *Dunaway* was decided subsequently to the oral argument in this case, it establishes no "new principle of law," *Chevron Oil Co. v. Huson*, 404 U.S. 97, 106, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), and we should apply it here. The general standard for nonretroactivity is discussed in *Chevron Oil, supra,* 404 U.S. at 106–07, 92 S.Ct. at 355:

First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, see, *e. g. Hanover Shoe, [Inc.] v. United Shoe Machinery Corp.* [392 U.S. 481, 496, 88 S.Ct. 2224, at 2233, 20 L.Ed.2d 1231 (1968)], or by deciding an issue of first impression whose resolution was not clearly foreshadowed, *e. g., Allen v. State Board of Elections* [393 U.S. 544, 572, 89 S.Ct. 817, at 835, 22 L.Ed.2d 1 (1969)]. Second, it has been stressed that "we must * * * weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." *Linkletter v. Walker* [381 U.S. 618, 629, 85 S.Ct. 1731, at 1738, 14 L.Ed.2d 601 (1965)]. Finally, we have weighed the inequity imposed by retroactive application, for "[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity." *Cipriano v. City of Houma* [395 U.S. 701, 706, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969)].

The proper application of this three-fold standard in Fourth Amendment exclusionary rule cases is to be found in *United States v. Peltier*, 422 U.S. 531, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975), in which the Court declined to give retroactive application to *Almeida-Sanchez v. United States*, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973) (warrantless Border Patrol auto searches, without probable cause, unconstitutional). In *Peltier* the Court held that where law enforcement agents acted pursuant to a validly enacted federal authorizing statute whose predecessor dated back to 1946, "supported by longstanding administrative regulations and continuous judicial approval," 422 U.S. at 541, 95 S.Ct. at 2319, a new

---

1. *But see* Schrock & Welsh, *Up from Calandra: The Exclusionary Rule as a Constitutional Requirement,* 59 Minn.L.Rev. 251 (1974).

finding that such conduct violates the Fourth Amendment and requires application of the exclusionary rule should not be applied retroactively. The rationale was that in such cases the law enforcement officers did not know, and could not reasonably be charged with knowing, that their conduct was improper and that therefore neither the "judicial integrity" purpose, nor the deterrent purpose, of the Fourth Amendment exclusionary rule would be served by retroactive application. 422 U.S. at 537–38, 541–42, 95 S.Ct. 2313.

■ The issue here may be stated as whether a detention in a police station "holding pen" for several hours, for investigative purposes, may be brought within some sort of an expanded *Terry v. Ohio, supra,* stop-and-frisk exception to the probable-cause requirement. The principal issue in *Brown v. Illinois, supra,* concerned the per se efficacy of *Miranda* warnings in dispelling the taint of prior police illegality. The illegality, however, in *Brown* was an improper detention, about which the Court had this to say:

> The impropriety of the arrest was obvious; awareness of that fact was virtually conceded by the two detectives when they repeatedly acknowledged, in their testimony, that the purpose of their action was "for investigation" or for "questioning."

422 U.S. at 605, 95 S.Ct. at 2262. While the Court also mentions the fact that the manner of arrest appeared to aim at causing "surprise, fright, and confusion," *id.,* the principal emphasis of its analysis of the arrest appears to lie in its investigative purpose. *Brown* alone would be good precedent for the conclusion that the detention in the present case was illegal, unless probable cause can be established.

The dissent cites several cases which expressly condone "investigative detentions" under certain conditions, and implies by this argument either that these cases were overruled by *Dunaway* or that if they were not overruled by *Dunaway* it would have been reasonable to think, before *Dunaway,* that their principles properly applied to the present fact situation. Closer analysis reveals, however, that neither of these suggestions is correct and that, at most, *Dunaway limits* the holding of these cases to their own, and substantially similar, fact situations.

*People v. Morales,* 42 N.Y.2d 129, 397 N.Y.S.2d 587, 366 N.E.2d 248 (1977), *cert. denied,* 434 U.S. 1018, 98 S.Ct. 739, 54 L.Ed.2d 765 (1978), held that "[l]aw enforcement officials may detain a person upon reasonable suspicion for questioning for a reasonable and brief period of time under carefully controlled conditions which are ample to protect the individual's Fifth and Sixth Amendment rights." 42 N.Y.2d at 135, 397 N.Y.S.2d at 590, 366 N.E.2d at 251. However, in applying this standard the court specifically mentioned various exceptional circumstances that obtained:

> A brutal and heinous felony had been committed. All of the indications raised by the "checkerboard square" of police investigation pointed at the defendant. Interrogation of the defendant was the only practical investigative technique open to the police. The period of detention was brief [fifteen minutes] and defendant, experienced in police procedures, was fully advised of his constitutional rights.

42 N.Y.2d at 132–33, 397 N.Y.S.2d at 588, 366 N.E.2d at 249. There has been no showing of any similar special circumstances in the present case (nor, of course, any showing to the contrary).[2]

---

**2.** It should be noted in passing that when *Dunaway* was decided by the Appellate Division in New York, 61 A.D.2d 299, 402 N.Y.S.2d 490 (1978) (the decision subsequently overturned by the Supreme Court), the dissent strongly contended that the majority was improperly broadening the rule of *Morales*:

> The majority read *Morales* to posit a broad test of reasonable police conduct under all the circumstances. Instead *Morales* sets forth a tightly drawn and carefully articulated rule limited to exceptional circumstances. In reversing the trial court's suppression order, the majority extend the ambit of *Morales*

The dissent cites a number of Second Circuit cases as establishing that *Morales* reflects what "was for many years the law of this circuit," dissent at 1017. All the cases here cited, however, precede *Brown v. Illinois, supra.* In fact, the most recent, *United States v. Thomas,* 250 F.Supp. 771, 790 (S.D.N.Y.1966), aff'd, 396 F.2d 310 (2d Cir. 1968) (statements made on street corner before entering police vehicle), precedes *Brown* by over half a decade.

More recent cases are mentioned. One, *United States v. Oates,* 560 F.2d 45 (2d Cir. 1977) (airport patdown), is clearly distinguishable from *Dunaway,* and from the present case, as it involved what the court there described as "a classic stop and frisk," 560 F.2d at 58. Whatever else *Dunaway* does, it certainly does not disturb the *Terry* standard as applied to the "classic stop and frisk." Another case, *United States v. Rico,* 594 F.2d 320 (2d Cir. 1979) (investigative stop at airport), is cited as supporting the legality, pre-*Dunaway,* of investigative detentions. Again, however, *Rico* is clearly distinguishable from *Dunaway* and from the present case. In *Rico,* the brief investigative stop which was justified under the *Terry* rationale, as explained in *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), "rapidly developed evidence sufficient to justify appellant's arrest." 594 F.2d at 326.

In our view, then, there is no basis for the position that *Dunaway* "overrules clear past precedent" or "decides an issue of first impression whose resolution was not clearly foreshadowed." True, the New York Court of Appeals had held that under limited circumstances investigative detention was legal without probable cause, and the Supreme Court in *Dunaway* reviewed and reversed the Appellate Division's application of that standard to a fact situation similar to that in the present case. Surely, however, one prior incorrect holding by a lower state court does not make a Supreme Court decision a "sharp break" with the past. There are no other cases cited in the dissent which were clearly overruled by *Dunaway.* We are thus compelled to find that on the present record, the Government has failed to show that the police and FBI agents could reasonably have believed that their conduct was lawful. Under principles stated in *Brown* and reiterated in *Dunaway,* an involuntary prolonged detention in a police station is an "arrest" requiring the usual degree of probable cause.

 On this record, there is a serious question whether the police had probable cause to arrest appellant when they brought him to the station. Although this is a closer question than the question whether appellant was arrested, the only evidence connecting him to the crime was apparently [3] that (like one of the robbers) he was a tall black male, that he was trying to enter an automobile, and that there was substantial reason to believe that the automobile had been used in the bank robbery the day before.

If the detention of appellant was illegal because not supported by probable cause, the Government has not shown that the taint had dissipated when the FBI secured confessions from appellant the afternoon of his arrest and the following day. To decide whether the statements were obtained by exploitation of the illegality of the arrest, we must examine "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, . . . and, particularly, the purpose and flagrancy of the official misconduct . . . ." *Brown v. Illinois, supra,* 422 U.S. at 603–04, 95 S.Ct. at 2261–62 (footnote omitted). Here, as in *Dunaway,* although the official misconduct was not egregious, the arrest and confession were very close in time, and

---

beyond these established parameters and in so doing violate Dunaway's rights in light of *Brown v. Illinois, supra.*

*Id.* at 307, 402 N.Y.S.2d at 495 (dissenting opinion). This is not to say that *Morales, supra,* was good law after *Brown v. Illinois* was decid-

ed or, a fortiori, after *Dunaway.* On that question we express no opinion.

**3.** We have only the FBI agent's hearsay testimony on this point. The Government did not call the arresting local police officers because the motion to suppress was not on this ground.

the defendant was in continuous police custody. The issue thus turns on whether "any intervening event of significance," *Dunaway, supra,* —— U.S. at 218, 99 S.Ct. at 2259, occurred. The Government suggests that the arrival of the FBI agents several hours after state police brought appellant to the "holding pen" was such an event because the FBI then had probable cause to arrest appellant. But this suggestion is not altogether convincing. As an abstract matter, such intervening probable cause would probably dissipate the taint, *see United States v. Morris,* 597 F.2d 341 (2d Cir. 1979) (per curiam). But there is some doubt here that the FBI agents had probable cause to arrest appellant when they did so, for they *subsequently* showed appellant several bank surveillance photographs and asked him to identify himself, stating that they had been "confused as to which one was Mr. Tucker." The only evidence on this record that the FBI had probable cause to arrest him *before* they told him he was under arrest (and before he blurted out "All right, you've got me" and identified himself from the photographs) is Agent Kaminski's testimony: "When I arrived [at the station], I had on my possession bank surveillance photographs . . . Based on that photograph, I called the Eastern District of New York and got authorization to arrest Charlie Tucker." This statement is too vague to demonstrate probable cause.

 The Government suggests that even if the April statements are suppressible, appellant adopted the admissions six months later on October 31, 1978, in the presence of his first lawyer and the prosecutor. But we do not believe that the failure to suppress the earlier statements was therefore harmless error. The defense had a colorable objection to the introduction at trial of those later statements, and pursuant to a stipulation the Government did not introduce these statements at trial. The earlier confessions *were* introduced at trial, and the Government heavily relied upon them in its prosecution for the two April robberies. Of course, appellant was also convicted of a third robbery, a conviction which was untainted by the other convictions, as the Government notes. Although appellant received a general twenty-year sentence on each of the three robberies, to run concurrently, the Government does not invoke the concurrent sentence doctrine, *see Weems v. Follette,* 414 F.2d 417 (2d Cir. 1969), *cert. denied,* 397 U.S. 950, 90 S.Ct. 973, 25 L.Ed.2d 131 (1970). Since there may be some prejudicial collateral consequences, *see United States v. Hines,* 256 F.2d 561, 563 (2d Cir. 1958), we decline to rely upon the doctrine.

Notwithstanding the Government's inadequate proof, we remand the case because it was not the Government's fault that the record is so "barren" (as the Government admits). We therefore remand for reconsideration, after further findings, of the following matters:

1. Whether the detention of appellant on April 26, 1978, prior to his questioning by FBI agents, constituted an "arrest" requiring the ordinary high degree of probable cause;

2. Whether the State had the requisite degree of probable cause to detain appellant;

3. If not, whether the statements obtained from appellant after his detention were obtained in exploitation of the illegal detention, giving particular attention to whether, when the FBI formally arrested appellant, they had probable cause to do so.

Cause remanded for further proceedings consistent with this opinion.

VAN GRAAFEILAND, Circuit Judge, dissenting:

In the opening sentence of its opinion in *Dunaway v. New York,* 442 U.S. 200, 202, 99 S.Ct. 2248, 2251, 60 L.Ed.2d 824 (1979),[1] the Court said:

> We decide in this case the question reserved 10 years ago in *Morales v. New York,* 396 U.S. 102, [90 S.Ct. 291, 24 L.Ed.2d 299] (1969), namely, "the ques-

---

1. *Dunaway* was decided after this case was briefed and argued.

tion of the legality of custodial questioning on less than probable cause for a full-fledged arrest" *id.*, at 106 [90 S.Ct. at 293].

My brothers decide the instant case as if the question "reserved" ten years ago had actually been decided. In so doing, they distort the purported justification for the exclusionary rule, which is the deterrence of official misconduct. *See United States v. Ceccolini*, 435 U.S. 268, 281, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978) (Burger, C. J., concurring in the judgment); *Stone v. Powell*, 428 U.S. 465, 486, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976).

In *United States v. Peltier*, 422 U.S. 531, 542, 95 S.Ct. 2313, 2320, 45 L.Ed.2d 374 (1975), the Court said:

> If the purpose of the exclusionary rule is to deter unlawful police conduct, then evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.

Applying this doctrine to cases involving retroactivity, the Court said:

> The teaching of these retroactivity cases is that if the law enforcement officers reasonably believed in good faith that evidence they had seized was admissible at trial, the "imperative of judicial integrity" is not offended by the introduction into evidence of that material even if decisions subsequent to the search or seizure have *broadened* the exclusionary rule to encompass evidence seized in that manner. *Id.* at 537, 95 S.Ct. at 2317 (emphasis supplied).

This is the doctrine that this Court has heretofore applied. *See United States v. Sotomayor*, 592 F.2d 1219, 1226–27 (2d Cir. 1979); *United States v. Corcione*, 592 F.2d

111, 118 (2d Cir.), *cert. denied*, 440 U.S. 975, 985, 99 S.Ct. 1545, 1801, 59 L.Ed.2d 794, 60 L.Ed.2d 248 (1979); *United States v. Diaz*, 577 F.2d 821, 824 (2d Cir. 1978); *United States v. Reda*, 563 F.2d 510, 511–12 (2d Cir. 1977), *cert. denied*, 435 U.S. 973, 98 S.Ct. 1617, 56 L.Ed.2d 65 (1978).[2]

*Chevron Oil Co. v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), relied upon by the majority, is not an exclusionary rule case. Where the conduct of police officers is at issue, the question is not whether a Supreme Court decision lays down a new rule clearly departing from prior authorities, but whether, under the law which pre-existed the decision, the police officers might properly be charged with knowledge that their conduct was unconstitutional. *United States v. Peltier, supra*, 422 U.S. at 542, 95 S.Ct. 2313; *Savina Home Industries, Inc. v. Secretary of Labor*, 594 F.2d 1358, 1363–65 (10th Cir. 1979); *United States v. Berry*, 571 F:2d 2, 3 (7th Cir.), *cert. denied*, 439 U.S. 840, 99 S.Ct. 129, 58 L.Ed.2d 138 (1978).

The officers who took appellant into custody were members of the New York City Police Department. Just one year prior to the incident in question, the New York Court of Appeals held that "[l]aw enforcement officials may detain an individual upon reasonable suspicion for questioning for a reasonable and brief period of time under carefully controlled conditions which are ample to protect the individual's Fifth and Sixth Amendment rights." *People v. Morales*, 42 N.Y.2d 129, 135, 397 N.Y.S.2d 587, 590, 366 N.E.2d 248, 251 (1977); *cert. denied*, 434 U.S. 1018, 98 S.Ct. 739, 54 L.Ed.2d 765 (1978).[3] This opinion followed reargument of the same case in which the Supreme Court had reserved decision in 1969. 396 U.S. 102, 90 S.Ct. 291, 24 L.Ed.2d 299 (1969). My brothers now charge the

---

**2.** *See also Linkletter v. Walker*, 381 U.S. 618, 636–40, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965); *Todd Shipyards Corp. v. Secretary of Labor*, 586 F.2d 683, 689–91 (9th Cir. 1978); *United States v. Walker*, 569 F.2d 502, 503–04 (9th Cir.), *cert. denied*, 435 U.S. 976, 98 S.Ct. 1625, 56 L.Ed.2d 70 (1978); *United States v. Montgomery*, 558 F.2d 311 (5th Cir. 1977).

**3.** *See also People v. Wise*, 46 N.Y.2d 321, 330, 413 N.Y.S.2d 334, 385 N.E.2d 1262 (1978); *People v. Boyer*, 65 A.D.2d 840, 841, 410 N.Y.S.2d 167 (1978); *People v. Dunaway*, 61 A.D.2d 299, 302–03, 402 N.Y.S.2d 490 (1978), *rev'd*, 442 U.S. 200, 99 S.Ct. 2248 (1979).

New York City Police Officers with a greater knowledge of constitutional law than

4. Judge Oakes says that the dissent relies upon "one incorrect holding by a lower state court", the "lower" state court being the Appellate Division Fourth Department, which decided *People v. Dunaway,* 61 A.D.2d 299, 402 N.Y. S.2d 490 (1978), and that no other cases cited in the dissent were clearly overruled by *Dunaway.* This statement will, I am sure, be of great comfort to the prosecuting attorneys in *People v. Morales, supra,* 42 N.Y.2d 129, 397 N.Y.S.2d 587, 366 N.E.2d 248, *People v. Wise, supra,* 46 N.Y.2d 321, 413 N.Y.S.2d 334, 385 N.E.2d 1262, and *People v. Boyer, supra,* 65 A.D.2d 840, 410 N.Y.S.2d 167, and to the New York courts as well. However, I am afraid that Judge Oakes and I read cases through different colored glasses. Instead of engaging in discourse with my learned colleague, I include the following excerpts from *Morales, Wise,* and *Boyer,* so that the reader may determine for himself whether these cases are consistent with *Dunaway* and whether, in view of their holdings, the New York City police officers in the instant case were guilty of bad faith in taking petitioner into custody.

*People v. Morales, supra,* 42 N.Y.2d at 131–32, 135–36, 137, 397 N.Y.S.2d at 587–588, 588, 590–591, 591–592, 366 N.E.2d at 248–249, 249, 251–252, 252:

This case is here for the second time. In the early morning hours of October 4, 1964, Addie Brown was viciously stabbed to death in the elevator of her Bronx County apartment building. There were no eyewitnesses to the murder and an extensive police investigation failed to uncover any direct evidence as to the identity of the killer. Yet the police did learn that Melvin Morales, a known narcotics addict, had frequented the building, had been inside the building at the time of the homicide, and had not been seen since the murder Morales' mother was a tenant in the building and Morales sojourned with her from time to time. Further, the building was the scene of frequent narcotics activity in which Morales allegedly participated. The police attempted to contact Morales through his mother. On October 13, 1964, nine days after the killing, Mrs. Morales received a telephone call from her son. She informed him that the police desired to question him. Morales agreed to appear at his mother's beauty parlor, her place of business. The police, who had seen previous efforts to contact Morales through his mother fail, had staked out the premises. When Morales arrived, the police advised him that they desired to speak to him. Morales replied, "Yes, I know." He was placed in a police car and driven to the precinct house. At the station house, Morales was informed of his constitutional rights and was questioned. Within 15 minutes, he confessed to the murder.

was then possessed by the judges of New York State's highest court.[4]

Defendant was convicted, after a jury trial, of murder in the first degree. The Appellate Division affirmed his conviction (27 A.D.2d 904, 280 N.Y.S.2d 520) and a further appeal was taken to our court. We sustained the conviction. It was conceded that the record would not support a conclusion that the police had probable cause to arrest defendant at the time he was taken into police custody. Further, the record on appeal did not establish that the defendant consented to being detained and questioned by the police. However, in a case of first impression, we held "that a suspect may be detained upon reasonable suspicion for a reasonable and brief period of time for questioning under carefully controlled conditions protecting his Fifth and Sixth Amendment rights." (*People v. Morales,* 22 N.Y.2d 55, 64, 290 N.Y.S.2d 898, 907, 238 N.E.2d 307, 314.)

．　　．　　．　　．　　．

Having concluded that probable cause to arrest was lacking, we adhere fully to the views articulated in our prior opinion in this case. Law enforcement officials may detain an individual upon reasonable suspicion for questioning for a reasonable and brief period of time under carefully controlled conditions which are ample to protect the individual's Fifth and Sixth Amendment rights. For a full exposition of our views, reference is made to our earlier opinion (*People v. Morales,* 22 N.Y.2d 55, 290 N.Y.S.2d 898, 238 N.E.2d 307, *supra.*) At this stage of the case, our attention is directed to the argument of the defendant, accepted by the dissenter at the Appellate Division, that the vitality of the *Morales* holding has been undercut by *Brown v. Illinois* (422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416, *supra*) and *People v. Martinez,* 37 N.Y.2d 662, 376 N.Y.S.2d 469, 339 N.E.2d 162, *supra.* We disagree.

In the *Brown* case, police officers investigating a homicide had been informed that the defendant was an acquaintance of the victim. On this information, and this information only, the officers broke into defendant's apartment, searched it, and arrested the defendant at gunpoint. The Supreme Court concluded that defendant's subsequent confessions should have been suppressed because the confessions were obtained as a result of an illegal arrest. The court, in language relied upon by this defendant, noted that the officers were aware that they lacked a sufficient predicate for the arrest. The arrest was "investigatory" and was an "expedition for evidence in the hope that something might turn up." (422 U.S. at p. 605, 95 S.Ct. at p. 2262.)

The *Brown* case has only limited relevance to the case before us. Of course, if the police

conduct here was illegal, then defendant might cogently contend that, under *Brown* and *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441, the confessions of Morales should be suppressed as fruit of the poisonous tree. However, the basic distinction is that the arrest in *Brown* was illegal; the limited detention of Morales was not. . . .

. . . . .

To sum up, our original view in *Morales* remains valid today. No case, in our court or in the United States Supreme Court, has the effect of vitiating the principle we enunciated. Actually, since *Morales*, our court has noted that the individual's right "to be free from an official interference by way of inquiry" is not absolute. (*People v. De Bour*, 40 N.Y.2d 210, 217, 386 N.Y.S.2d 375, 381, 352 N.E.2d 562, 568.) Rather, "a policeman's right to request information while discharging his law enforcement duties will hinge on the manner and intensity of the interference, the gravity of the crime involved and the circumstances attending the encounter." (40 N.Y.2d at p. 219, 386 N.Y.S.2d at p. 382, 352 N.E.2d at p. 569.)

*People v. Boyer, supra,* 65 A.D.2d at 840–41, 842, 410 N.Y.S.2d at 167–168, 168–169:

Appeal from a judgment of the County Court of Albany County, rendered September 22, 1977, upon a verdict convicting defendant of the crimes of burglary in the third degree, and grand larceny in the second degree. At about 4:30 A.M. on June 2, 1977, two police officers in a patrol car noticed defendant standing in the street in front of the premises at 345 Broadway in the City of Albany, calling for a taxi which was about three blocks away. They proceeded slowly past him and, their suspicions being aroused, went around the block and returned to 345 Broadway and found defendant gone. They then found a window broken in 345 Broadway, and other signs of entry into the building. They then broadcast a description of defendant. The officers began checking the neighborhood for defendant and went into Coulson's News Center on Broadway where they were advised that someone matching defendant's description had been seen getting into a yellow colored cab. This information was also broadcast. Shortly thereafter, another patrol car saw a cab near the intersection of Madison Avenue and Green Street and they noticed a black male in the cab who appeared to match the description which had been broadcast. They stopped the cab, and asked him to step out so they could speak to him. Defendant denied that he had been on Broadway, but since he matched the description that had been broadcast, the officers who had made the broadcast were called to the scene. These officers identified him, and he was asked if he would go with them to the Detective Office. Defendant had a cut on the back of his left hand. They then proceeded to the Detective Division Office where he was advised that they were investigating a burglary, and advised him of his "*Miranda*" rights. He was asked if he would empty his pockets which he did. Among the articles which were in his pockets were some watches, a set of keys and foreign currency. The officers then obtained a list of the property which was missing from the scene of the burglary which included two stop watches and a set of keys. Two stop watches and the set of keys which had been in defendant's pockets were thereafter identified by the owner as having been reported missing in the burglary. Defendant thereafter admitted his participation in the burglary and signed a confession. Defendant then moved to suppress the confession and the items obtained from defendant's pockets. After the hearing, the motion was denied . . . . .

"Where a police officer entertains a reasonable suspicion that a particular person has committed, is committing or is about to commit a felony or misdemeanor, the CPL authorizes a forcible stop and detention of that person (CPL 140.50, subd. 1; see *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889; *People v. Cantor* [36 N.Y.2d 106, 365 N.Y.S.2d 509, 324 N.E.2d 872,] *supra*)." (*People v. De Bour*, 40 N.Y.2d 210, 222, 223, 386 N.Y.S.2d 375, 384, 352 N.E.2d 562, 567.) In this case, the police were justified in stopping the taxicab to investigate the suspected burglary. The police officer's testimony that he knew that a burglary had occurred clearly relates to when the apparent burglary was confirmed by the owner of the premises. Knowing that a burglary had apparently taken place and that the taxi passenger met the description of the man originally observed near the burglary location, the officers act reasonably in stopping the cab and detaining the passenger based upon "the common-law power to inquire for purposes of maintaining the *status quo* until additional information could be acquired". (*People . v. Dibble*, 59 A.D.2d 796, 398 N.Y.S.2d 755.) The police were justified in stopping and detaining defendant based upon specific and articulable facts which, taken together with rational inferences from these facts, reasonably warranted the intrusion. The denial of the motion to suppress should be affirmed.

*People v. Wise, supra,* 46 N.Y.2d at 330, 413 N.Y.S.2d at 339–40, 385 N.E.2d at 1267–68:

These statements of an eyewitness placing defendant at the scene of the crime were sufficient to form the basis for a custodial detention (see, e. g., *People v. Morales*, 42 N.Y.2d 129, 135–136, 397 N.Y.S.2d 587, 590–591, 366 N.E.2d 248, 251–252). So long as the police are solicitous of an individual's rights, and carefully delimit the scope of the intrusion, a custodial detention predicated

In applying the exclusionary rule in this case, the majority also imputes to the New York City police officers more legal acumen than was possessed by the very capable district judge who, under pre-*Dunaway* standards, found that "the police did have probable cause to bring in the defendants concerning suspicion of bank robbery." That the law as enunciated in *Morales* was for many years the law of this circuit can hardly be disputed. *See United States v. Drummond*, 354 F.2d 132, 145 (2d Cir. 1965); *United States v. Middleton*, 344 F.2d 78, 83 (2d Cir. 1965); *United States v. Vita*, 294 F.2d 524, 529–30 (2d Cir. 1961), *cert. denied*, 369 U.S. 823, 82 S.Ct. 837, 7 L.Ed.2d 788 (1962); *United States v. LaVallee*, 270 F.2d 513, 518 (2d Cir. 1959), *cert. denied*, 361 U.S. 950, 80 S.Ct. 403, 4 L.Ed.2d 382 (1960); *United States v. Thomas*, 250 F.Supp. 771, 790 (S.D.N.Y.1966), *aff'd*, 396 F.2d 310 (2d Cir. 1968). In *United States v. Vita*, 294 F.2d at 529–30, then Chief Judge Lumbard explained the applicable legal principles as follows:

> Moreover, even if Vita had been involuntarily detained for questioning or had believed that he had no choice but to accompany the F.B.I. agents to headquarters, we would not necessarily hold such detention to be an "arrest" within the meaning of Federal Rule of Criminal Procedure 5(a). The rule does not apply to a case in which federal officers detain a suspect for a short and reasonable period in order to question him. The right to question has its roots in early English practice and

was approved by the common law commentators and the courts. . . . This prerogative of police officers to detain persons for questioning is not only necessary in order to enable the authorities to apprehend, arrest, and charge those who are implicated; it also protects those who are readily able to exculpate themselves from being arrested and having formal charges made against them before their explanations are considered.

Only two years ago, this Court said that "although every arrest is a form of detention, the converse is not true." *United States v. Oates*, 560 F.2d 45, 57 (2d Cir. 1977). We there stated that "a law enforcement officer has the power, indeed the obligation, to detain a person temporarily for the purpose of interrogating him if the officer reasonably suspects that the detainee has committed . . . a crime." *Id.* at 58–59 (footnote omitted).[5] We said that a balancing test should be applied in determining the legality of the detention, one that weighed the seriousness of the detention against the seriousness of the suspected offense. *Id.* at 59. *See also United States v. Rico*, 594 F.2d 320, 326 (2d Cir. 1979), where we found "reasonable" the conduct of a DEA agent in taking defendants to a police station to verify Rico's assertion that certain powder in a plastic bag was not heroin.[6]

In *Dunaway*, the Supreme Court rejected the balancing test except for narrowly-defined intrusions. 442 U.S. at 208, 99 S.Ct. at 2254. Judge Oakes says that, in so

---

upon reasonable suspicion can hardly be termed "unreasonable" (*People v. Morales, supra*). On this record, therefore, defendant's pretrial suppression motion was correctly denied.

In *People v. Dunaway, supra*, 61 A.D.2d at 302, 402 N.Y.S.2d at 492, the Court said:

> We believe that this case is controlled by the recent decision of the Court of Appeals in *People v. Morales* [, 42 N.Y.2d 129, 397 N.Y. S.2d 587, 366 N.E.2d 248] . . . .

Judge Oakes says that the New York City police officers could not reasonably have had the same belief. I respectfully disagree.

5. In *Oates*, appellants unsuccessfully contended that they "were under arrest from the in-

stant they were asked by Customs Security Officers Fromkin and DeAlfi to accompany them to a nearby office." 560 F.2d at 57.

6. In *Rico*, the Court said:

> In the bag Whitmore found a plastic bag containing a brown powdery substance that looked to him like heroin. He asked Rico what it was and Rico said it was nothing. At that point Whitmore advised the three that they would have to go with him to the police desk, which was at least three quarters of a mile away, and took them outside to obtain police assistance.

594 F.2d at 323.

doing, the Supreme Court simply "restated" Fourth Amendment principles. However, Justice Brennan, who wrote for the Court in *Dunaway*, stated that the Court granted certiorari to "clarify" Fourth Amendment requirements. 442 U.S. at 206, 99 S.Ct. 2253. I suggest that the difference in terminology is more than mere semantics.

Application of the exclusionary rule imposes an enormous cost upon society. *Brewer v. Williams*, 430 U.S. 387, 421–22, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) (Burger, C. J., dissenting). "The cost is particularly high because the exclusionary rule 'deflects the truthfinding process and often frees the guilty.'"[7] *Gates v. Henderson*, 568 F.2d 830, 839 (2d Cir. 1977) (en banc), *cert. denied*, 434 U.S. 1038, 98 S.Ct. 775, 54 L.Ed.2d 787 (1978) (*quoting Stone v. Powell*, 428 U.S. 465, 490 (1976); *see United States v. Ceccolini*, 542 F.2d 136, 143–44 (2d Cir. 1976) (Van Graafeiland, J., dissenting), *rev'd*, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978). Because "neither deterrence nor judicial integrity, the two purposes served by the exclusionary rule", will be furthered by retroactive application of Dunaway's clarifying holding, and because of the "obvious burden on the administration of justice" that will be created by such retroactive application, *see United States v. Reda, supra*, 563 F.2d at 512, I respectfully dissent.

---

**7.** This is nowhere better illustrated than in *Dunaway* itself, where the defendant, convicted of felony murder and attempted robbery, is now walking the streets a free man. Before this Court decides that *Dunaway* should be applied retroactively, it should gravely consider how many other persons convicted of murder, robbery or rape will be returned to the streets as a result of its holding.